731 A.2d 1070

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JOHN CHEW, DEFENDANT–APPELLANT.

Argued March 17, 1998—Decided June 3, 1999.

184

*Mordecai D. Garelick,* Assistant Deputy Public Defender, *Claudia Van Wyk* and *Matthew Astore,* Deputy Public Defenders II, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

*Bennett A. Barlyn,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey).

· The opinion of the Court was delivered by

PORITZ, C.J.

## TABLE OF CONTENTS

I *Facts* .............................................190
II *Proportionality Review* ............................195
 A. *Universe of Cases* ...............................196
 B. *Method of Classifying Cases* .....................197
III *Comparison of Cases* ...............................198
 A. *Adjustments in Comparison Group* ...............199
 B. *Frequency Analysis* ............................201
 1. *Salient–Factors Test* ........................202
 2. *Index–of–Outcomes Test* ......................204
 C. *Precedent–Seeking Review* ......................209
 1. *Relevant Factors* ............................210
 a. *Defendant's Moral Blameworthiness* .....211
 b. *Degree of Victimization* .................213
 c. *Defendant's Character* ...................213
 2. *Defendant's Comparison Group* ...............214
 3. *Comparison of Similar Cases to Defendant's Case* ................................215
IV *Other Arguments* .....................................220
 A. *Racial Bias in the Administration of the Death Penalty* ...................................221
 B. *Extreme Mental or Emotional Disturbance Mitigating Factor* ............................223
V *Conclusion* ..........................................226
 *APPENDIX A* ......................................226
 I. *Pecuniary Motive Other Pecuniary Advantage: I–3* ......................................226
 A) *Celestine Payne 1* ............................226
 II. *Pecuniary–Motive Contract Killers: I–1* ..........228
 A) *Randy Burroughs* ...........................228
 B) *James Clausell 1A and 1B* ...................229
 C) *Anthony DiFrisco 1A and 1B* ................231
 D) *Danny Harris* ..............................233
 E) *Richard Irizarry* ...........................235
 F) *Miguel Melendez* ...........................238
 G) *Charles Pinchom* ...........................240
 III. *Pecuniary–Motive Principal Killers: I–2* .........241
 A) *Francis Brand* .............................241
 B) *Herbert and William Engel* ..................242
 C) *Robert Marshall* ...........................246
 D) *Celestine Payne 2* ..........................248

In *State v. Chew,* 150 *N.J.* 30, 695 *A.*2d 1301 (1997) (*Chew I* ), we affirmed John Chew's conviction and death sentence for the murder of Theresa Bowman. We "preserve[d] defendant's challenge to the proportionality of his death sentence" for later review, *id.* at 88, 695 *A.*2d 1301; *see N.J.S.A.* 2C:11–3e, and now find no disproportionality.

# I

## *Facts*

The facts are set forth in detail in *Chew I, supra,* 150 *N.J.* at 42–50, 695 *A.*2d 1301. We repeat here only that which is relevant to our proportionality review.

On the morning of January 13, 1993, the police found the body of Theresa Bowman in the driver's seat of John Chew's Corvette. The car was parked in the rear of the Woodbridge Hilton parking lot. Ms. Bowman's throat had been slashed approximately ten hours earlier. An eyewitness informed the police that he had seen a man "grabbing" a woman in the car. When the police interviewed Chew at his home that afternoon, he told them that he had last seen Ms. Bowman on the evening of January 12, 1993. Chew claimed that Ms. Bowman had accompanied him to the home of his sister, Crystal Charette, and then had driven off alone in his Corvette. Chew said that after Ms. Bowman left, he remained with his sister and her roommate, Helen Borden, for an hour-and-a-half and then both women drove him to his residence.

After the police obtained Chew's first statement, Chew returned to his sister's home. He told his sister and her roommate that he expected to be blamed for something he had not done. He said that a drug deal had gone bad and that he needed an alibi. He asked the two women to tell the police that they had been with

him on the evening of January 12, and that he had remained at home the entire evening. They agreed.

On January 14, 1993, the police spoke to Chew's sister and her roommate. At this first meeting, the women corroborated Chew's version of his activities on the night of the murder. Later that day, further questioning of Chew produced a taped statement. Chew repeated his initial story and provided information about his relationship with Ms. Bowman. At the time of the murder, the couple had been living together for over four years.

On January 15, 1993, the police received several telephone calls implicating Chew in Ms. Bowman's murder. The first call came from an insurance salesman who had sold the couple a joint life insurance policy in 1991. Under the policy, Chew was to receive $250,000 on the death of Ms. Bowman. The agent informed the police that on New Year's Eve 1992, just thirteen days before the murder, Chew had stopped at the agent's home and had asked to pay the December premium in cash. Chew told the agent that his check had bounced and that he did not want the policy to lapse. The agent told the police that no customer had ever come directly to his home with cash before.

George Tilton, a former employee of Chew's, also called the police. Tilton informed the police that in 1991, Chew had on numerous occasions offered him $10,000 to kill Ms. Bowman. According to Tilton, Chew wanted to kill his girlfriend in order to collect on her life insurance.

The third call came from Chew's son, Robert Chew, who at the time was incarcerated at the Ocean County Jail. Robert Chew said that in December 1991 his father told him about a plan to kill Ms. Bowman for life insurance proceeds.

The police received yet additional corroboration from Randy F., a Linden mechanic, who said that he and Ms. Bowman were having an affair. According to Randy F., Ms. Bowman had planned to leave Chew and move in with him as soon as Chew recovered a monetary settlement from an unrelated lawsuit. At

trial, Randy F. testified that Ms. Bowman phoned him on January 12 and told him that she and Chew were driving to a location on the Garden State Parkway to pick up Chew's settlement check. All of this information suggested both a motive and a reason for the timing of Ms. Bowman's murder: Chew wanted the $250,000 insurance payment due on her death and feared that she would soon leave him and cancel the policy.

On January 23, the police arrested Chew, and a team of investigators again questioned his sister and her roommate. This time, the women told a different story, one that implicated John Chew. Chew's sister said that Chew called her from his home on the night of the murder and asked her to pick him up at the Woodbridge Hilton. Chew told his sister that he and Ms. Bowman were going to the hotel to pick up her paycheck and that he wanted to return immediately, but Bowman wished to remain with friends. When Chew's sister arrived with Borden at the hotel parking lot, she saw Chew get out of his Corvette. He was not injured, but there was blood on his clothing. Chew removed his outer clothes, put them into a plastic bag, and instructed Borden to put bleach in the bag. He then discarded the bag. Chew's sister told the police that after they returned to Chew's home, her brother told her what to tell the police and threatened her.

Borden's story was similar. She said she heard a "scream," that she believed came from the Corvette. About a minute later, Chew ran out of the Corvette and got into the car with his sister and Borden.

After being confronted with the inculpatory statements of his sister and her roommate, Chew agreed to give a taped statement, but refused to discuss the murder. His first account merely placed him at the scene of the crime and acknowledged that his sister and her roommate had driven him home from the Woodbridge Hilton. The trial court held that this statement was inadmissible because it was obtained in violation of defendant's right to counsel.

Later, after the taped statement concluded, Chew provided the police with a more detailed version of the events of January 12. This time Chew said that he and Ms. Bowman had gone to the Woodbridge Hilton on the night of the murder to complete a drug deal. Ms. Bowman was to handle the deal because only she knew the other drug dealer. Chew stated that he waited inside the Hilton, and that when he returned to the car Ms. Bowman was dead.

Chew unsuccessfully attempted to contact his lawyer and then began to talk about the crime again. He spoke of the cocaine deal, but this time acknowledged that Ms. Bowman was alive when he returned to the Corvette. According to Chew, Ms. Bowman claimed she was "ripped off" by the buyer and she and Chew began to quarrel. During this argument Ms. Bowman told Chew that she was having an affair with Randy F. Chew then "went off" on her.

After Chew gave this new account, the police readministered Miranda warnings and Chew signed a waiver. He gave another taped statement in which he again acknowledged driving to the Woodbridge Hilton with Ms. Bowman on the night of January 12 to sell a kilo of cocaine. As earlier, Chew told the police that he did not know the prospective buyer because the buyer was Ms. Bowman's contact. He said that Ms. Bowman waited in the car for the buyer and that he stayed in the doorway of the Hilton. When he returned to the Corvette after about forty-five minutes, Ms. Bowman told him that "she got ripped off," and they began to argue. Chew said that Ms. Bowman hit him "a couple of times in [the] face" and scratched him in the chin. He claimed he did not remember stabbing her.

After the fight, Chew left with his sister and her roommate who, at his request, had come to pick him up at the Hilton. He remembered being frightened because of all the blood, but denied knowing whether he had committed the murder. Chew also recalled getting rid of his bloody clothing and asking his sister and her roommate not to talk to the police about his whereabouts on

the night of the murder. He claimed he did not remember threatening them, but acknowledged that "there's so much I don't remember." At the Miranda hearing, two corrections officials testified that Chew did not seem to be under the influence of drugs or undue stress when he made this statement; rather, he appeared calm and cooperative.

Defendant was indicted for purposeful or knowing murder by his own conduct, possession of a weapon for an unlawful purpose, terroristic threats, and other offenses later dismissed by the trial court. The prosecutor served notice of one aggravating factor: that defendant killed Ms. Bowman as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value. *N.J.S.A.* 2C:11–3c(4)(d). On June 13, 1995, the jury returned a verdict of guilty on two counts: purposeful or knowing murder by defendant's own conduct, in violation of *N.J.S.A.* 2C:11–3a(1) or (2), and possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4d.

At the penalty-phase trial, the defense informed the jury, through a member of the parole board, that thirty years in prison was Chew's potential alternative sentence. A number of witnesses testified about the defendant's childhood and personal relationships.

> A forensic social worker interviewed family members and reviewed family records. She described a family history of beatings, drinking binges, abuse, unfaithfulness, and lack of love or encouragement. Defendant's mother and sister testified similarly.
>
> Defendant's eleven-year-old daughter Valerie spoke of her love for her father and of her contacts with him. A family therapist concluded that Valerie's continued contacts with her father would have a positive effect and that the two of them enjoyed a positive relationship. Defendant gave an allocution in which he sought mercy for the sake of his daughter.
>
> [*Chew I, supra,* 150 *N.J.* at 49–50, 695 *A.2d* 1301.]

The jury found Chew guilty of murdering Ms. Bowman in expectation of the receipt of anything of pecuniary value. The jury also found ten mitigating factors under the statutory catchall factor, *N.J.S.A.* 2C:11–3c(5)(h). Having unanimously determined that the single aggravating factor outweighed the mitigating fac-

tor, the jury returned a death penalty verdict. The court merged the weapon conviction with the murder conviction and sentenced Chew to death. Defendant appealed directly to this Court as of right, *R.* 2:2–1(a)(3), and we affirmed his conviction and sentence, *Chew I, supra,* 150 *N.J.* at 88, 695 *A.*2d 1301.

In *Chew I* we noted and preserved defendant's request for proportionality review, *ibid., see N.J.S.A.* 2C:11–3e. We now find that defendant has not shown his death sentence to be disproportionate.

## II

### *Proportionality Review*

 The principal goal of proportionality review "is to determine whether a particular defendant's death sentence is disproportionate" when compared to the sentences of other defendants who are similarly situated. *State v. DiFrisco,* 142 *N.J.* 148, 160, 662 *A.*2d 442 (1995) *(DiFrisco III ); see N.J.S.A.* 2C:11–3e. By this comparison, the Court seeks " 'to ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency.' " *State v. Loftin,* 157 *N.J.* 253, 265, 724 *A.*2d 129 (1999) *(Loftin II )* (quoting *State v. Marshall,* 130 *N.J.* 109, 131, 613 *A.*2d 1059 (1992) *(Marshall II )).* A defendant's death sentence is considered disproportionate if other defendants in the jurisdiction who have similar characteristics commit similar offenses and receive life sentences. *State v. Martini,* 139 *N.J.* 3, 20, 651 *A.*2d 949 (1994) *(Martini II ); State v. Bey,* 137 *N.J.* 334, 343, 645 *A.*2d 685 (1994) *(Bey IV ); Marshall II, supra,* 130 *N.J.* at 131, 613 *A.*2d 1059. The defendant must show that his "death sentence is aberrational." *Bey IV, supra,* 137 *N.J.* at 352, 645 *A.*2d 685.

 "There are two aspects of proportionality review: 'substantive,' or 'offense-oriented,' review; and 'procedural,' or 'offender-oriented,' review." *DiFrisco III, supra,* 142 *N.J.* at 160, 662 *A.*2d 442 (quoting *Marshall II, supra,* 130 *N.J.* at 126, 613 *A.*2d 1059).

Substantive or offense-oriented review examines "the offense to determine whether the punishment imposed is excessive in relation to the crime itself." *Ibid.; see also Martini II, supra,* 139 *N.J.* at 20, 651 *A.*2d 949. Procedural or offender-oriented review focuses on the defendant. "In such review, the question is 'whether the punishment fits the criminal.'" *DiFrisco III, supra,* 142 *N.J.* at 161, 662 *A.*2d 442 (quoting *Marshall II, supra,* 130 *N.J.* at 129, 613 *A.*2d 1059) (additional internal quotations omitted). Our review here is offender oriented.

### A. *Universe of Cases*

■ Our first step in any proportionality review is to determine the universe of cases that we will use to compare with the defendant's case. The 1992 amendment to *N.J.S.A.* 2C:11–3e limits this comparison group to only those cases in which a death sentence has actually been imposed. In *Loftin II,* however, we indicated that we were uncertain whether this limitation would "preclude[ ] meaningful appellate review." 157 *N.J.* at 264, 724 *A.*2d 129. We noted that our cases prior to *Loftin II* had "established the size of the proportionality review universe to include both death-eligible defendants and defendants who proceed to a penalty trial . . . . [and] that such broad categories would provide the most useful information about how decisions are made in the capital sentencing system by prosecutors and by juries." *Id.* at 264–65, 724 *A.*2d 129 (citations omitted). Because questions had been raised about the efficacy of the present system, we asked a special master to examine our proportionality review methodologies and report to the Court. *Id.* at 265, 724 *A.*2d 129. Until our review of the special master's findings and recommendations is complete, and we are able to determine the effect of the 1992 amendment on our review function, we "will continue to compare all death-eligible homicides with the case before us." *Id.* at 317, 724 *A.*2d 129.

The Administrative Office of the Courts ("AOC") compiled the data that we will use in this case in the *Chew/Cooper/Harvey*

*Report.* The report includes all death-eligible cases known to the AOC as of July 31, 1997. Memorandum from Joseph J. Barraco, Esq., Acting Assistant Director, AOC Criminal Practice Division and Nina Rossi, Esq., Assistant Chief, Criminal Court Services, Criminal Practice Division, to Stephen W. Townsend, Clerk of the New Jersey Supreme Court 1 (Dec. 3, 1997) (*Barraco Memorandum* ) (on file with the AOC). There were, as of that date, 401 death-eligible cases, of which 163 or forty-one percent, proceeded to a penalty trial. *Chew/Cooper/Harvey Report,* tbl. 3. Of the 163 penalty-trial cases, fifty, or thirty-one percent, resulted in a death sentence. *Id.,* tbl. 2. The overall death-sentencing rate was therefore twelve percent ($^{50}\!/_{401}$). *Id.,* tbl. 1.

### B. *Method of Classifying Cases*

█ Once the universe of cases is determined, a database is developed from the facts of the comparison cases. In considering these data, "we use two approaches: an *a priori* approach and an empirical approach." *Loftin II, supra,* 157 *N.J.* at 323, 724 *A.*2d 129; *see also DiFrisco III, supra,* 142 *N.J.* at 163–64, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 24, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 345, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 141–42, 613 *A.*2d 1059. We have learned through experience the factors that affect capital-sentencing decisions, and in the *a priori* approach, we examine cases based on those factors. *Loftin II, supra,* 157 *N.J.* at 323, 724 *A.*2d 129; *DiFrisco III, supra,* 142 *N.J.* at 164, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 24, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 345, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 141–42, 613 *A.*2d 1059. "In the empirical method, we review both defendants who were sentenced to death and those who were not to 'identify those characteristics that determine the patterns' " behind disparate sentencing outcomes. *Loftin II, supra,* 157 *N.J.* at 323–24, 724 *A.*2d 129 (quoting *DiFrisco III, supra,* 142 *N.J.* at 164, 662 *A.*2d 442); *see also Martini II, supra,* 139 *N.J.* at 24, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 345, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 142–43, 613 *A.*2d 1059. By this method we sort the cases based on

the factors found by prosecutors and juries to be "most relevant." *Marshall II, supra,* 130 *N.J.* at 143, 613 *A.*2d 1059.

█ Consistent with our past practice, reversed death penalty cases "where the prosecutor chose not to proceed capitally on remand" are included in the death-sentenced universe. *Loftin II, supra,* 157 *N.J.* at 324, 724 *A.*2d 129; *see also DiFrisco III, supra,* 142 *N.J.* at 164, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 25–26, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 345–49, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 194 n. 10, 613 *A.*2d 1059. We continue to believe that the original death penalty verdict is a useful reflection of jurors' views of a defendant's deathworthiness. *Loftin II, supra,* 157 *N.J.* at 324, 724 *A.*2d 129. Also, we will, as before, consider data that includes the defendant and data that excludes him. *Ibid.*

## III

### *Comparison of Cases*

█ Having established both the universe of cases and the standards by which the cases are coded, we " 'next group those cases according to their comparative levels of blameworthiness.' " *Ibid.* (quoting *Martini II, supra,* 139 *N.J.* at 28, 651 *A.*2d 949). In this analysis "[w]e measure blameworthiness according to statutory aggravating and mitigating factors as well as nonstatutory factors based on objectively-verified measures of blameworthiness." *Id.* at 324–25, 724 *A.*2d 129 (internal quotations omitted). We evaluate these factors using two approaches: frequency analysis and precedent-seeking review. In frequency analysis, we compute the rate of death sentencing in cases similar to defendant's case in an attempt to "measure[ ] the societal consensus that death is the appropriate penalty in the measured cases." *Bey IV, supra,* 137 *N.J.* at 350, 645 *A.*2d 685. In precedent-seeking review, we engage in a traditional case-by-case analysis and "compare the defendant's case to factually-similar cases to determine whether the defendant is deathworthy in light of similarly-

situated defendants." *Martini II, supra, 139 N.J.* at 28, 651 *A.*2d 949. As we discussed in *Loftin II, supra,* 157 *N.J.* at 296, 724 *A.*2d 129, because of concerns about the reliability of frequency review, we have focused on precedent-seeking review in deciding whether a defendant's death sentence is disproportionate.

## A. *Adjustments in Comparison Group*

The AOC places the various death-eligible defendants in categories and subcategories based on the aggravating factors present in their cases. *See Chew/Cooper/Harvey Report,* tbl. 7. There are thirteen categories, each of which contains two to seven subcategories.[1]

■ For the purposes of frequency review, defendant has not asked the Court to make any changes to the AOC category assignments. The State, however, objects to the AOC's inclusion of Walter Williams and Michael Rose in the pecuniary-motive category, and of James Clausell IB in the death-eligible universe. We agree with the State that Williams and Rose should be deleted from Chew's comparison group because in both cases the jury rejected the pecuniary-motive aggravating factor at defendants' penalty trials. *See also DiFrisco III, supra,* 142 *N.J.* at 170, 662

---

1 The thirteen basic categories are:

 (A) Multiple victims;
 (B) Prior Murder Conviction without A above;
 (C) Sexual Assault without A–B above;
 (D) Victim a Public Servant without A–C above;
 (E) Robbery without A–D above; (F) Arson without A–E above;
 (G) Burglary without A–E [sic] above;
 (H) Kidnaping without A–G above;
 (I) Pecuniary Motive without A–H above;
 (J) Torture/aggravated assault without A–I above;
 (K) Depravity of Mind without A–J above;
 (L) Grave risk of death as primary statutory aggravating circumstance without A–K above;
 (M) Escape Detection, etc., as sole factor without A–L above.
 [*Chew/Cooper/Harvey Report,* tbl. 7.]

*A.*2d 442 (deleting Williams from DiFrisco's pecuniary-motive comparison group because "the jury rejected the pecuniary-motive aggravating factor at his penalty trial").[2] Chew also agrees that Williams does not belong in his comparison group. As to the inclusion of Clausell 1B, because the defendant was retried for capital murder he was properly included in the death-eligible universe.

 For the purposes of precedent-seeking review, defendant has suggested that we consider an additional thirty-four cases. Thirty-two of those cases are robbery murders, a type of murder that is significantly different from pecuniary-motive murders. *See Chew I, supra,* 150 *N.J.* at 56, 695 *A.*2d 1301. Indeed, pecuniary-motive murders are three-and-a-half times more likely to result in death sentences than are robbery-murders. *Chew/Cooper/Harvey Report,* tbl. 7. As to the other two cases, one was a burglary murder in which the prosecution did not submit the pecuniary-motive aggravating factor to the jury, and the other involved multiple victims and resulted in an AOC placement in the A(1) multiple victim category. Again, we decline to alter the decision to place a defendant in only one comparison category. *DiFrisco III, supra,* 142 *N.J.* at 167, 662 *A.*2d 442.[3]

---

[2] Although the *Rose* jury rejected the pecuniary-motive aggravating factor, Rose was included in DiFrisco's comparison group. *DiFrisco III, supra,* 142 *N.J.* at 208, 662 *A.*2d 442. We understand that it is the AOC's informal practice generally to exclude defendants from the I pecuniary-motive category where the jury has rejected the c(4)(d) factor. We will follow that practice here.

[3] The dissent once again takes issue with the principle of unique classification and seeks to include certain robbery-murder defendants in Chew's comparison group because, in the dissent's view, their crimes have certain characteristics in common with Chew's crime. *Post* at 263–64, 731 *A.*2d at 1113–14. No doubt we could discover still other defendants whose murders share common factors. Our comparisons are not an exact science, but rather an aid to understanding a defendant's death sentence in relation to other defendants whose murders share the same "essential attribute." *Loftin II, supra,* 157 *N.J.* at 321, 724 *A.*2d 129.

### B. *Frequency Analysis*

We seek to determine through frequency analysis whether there is a societal consensus that the defendant in the case before us is sufficiently culpable such that his sentence may be deemed not aberrational. We therefore compare the defendant's culpability with that of other defendants, those who have been sentenced to death and those who have not. "The basic question in the frequency approach is whether the degree of blameworthiness in the instant case reasonably supports an expectation that such a case will generally result in a death sentence." *Martini II, supra,* 139 *N.J.* at 30, 651 *A.*2d 949. Some statistical disparity is permissible, indeed expected. "Proportionality review seeks to determine only whether a particular death sentence is aberrational, not whether it compares perfectly with other sentences." *Bey IV, supra,* 137 *N.J.* at 352, 645 *A.*2d 685. For this reason, "the Court has repeatedly declined to set a threshold at which the imposition of the death penalty becomes disproportionate." *Loftin II, supra,* 157 *N.J.* at 322, 724 *A.*2d 129; *see also DiFrisco III, supra,* 142 *N.J.* at 171–72, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 30, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 351, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 152–54, 613 *A.*2d 1059. Frequency analysis is not designed to provide "answers, but guidelines." *DiFrisco III, supra,* 142 *N.J.* at 172, 662 *A.*2d 442.

In *Martini II, supra,* 139 *N.J.* at 31–32, 651 *A.*2d 949, we explained more fully the statistical techniques used in frequency analysis. We will not repeat that explanation here except to note that before *Loftin II,* frequency review consisted of three tests: the salient-factors test; the numerical-preponderance test; and the index-of-outcomes test. *See DiFrisco III, supra,* 142 *N.J.* at 171, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 29–30, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 350–51, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 154, 613 *A.*2d 1059. In *Loftin II, supra,* 157 *N.J.* at 295, 724 *A.*2d 129, we eliminated the numerical-preponderance test because of its inherent limitations. We decided to

conduct frequency review by means of the salient-factors and index-of-outcomes tests even as the Special Master we appointed developed recommendations in respect of these two tests. 157 N.J. at 317, 724 A.2d 129. Although the Special Master has submitted his report, Honorable David S. Baime, *Report to the New Jersey Supreme Court: Proportionality Review Project* (Apr. 28, 1999), we have not yet heard oral argument on the recommendations it contains, and therefore decline to comment on or use the report in this case. We note that both the defendant and the dissent, *post* at 266, 731 A.2d at 1115, call into question the validity of the frequency approach, pointing to small sample sizes and large confidence intervals. For a discussion on confidence intervals *see infra* at 209 n. 6, 731 A.2d at 1084 n. 6. We too remain concerned about the statistical reliability of frequency analysis, and shall, as in our prior proportionality review opinions, rely principally on precedent-seeking review. *Loftin II, supra,* 157 N.J. at 296, 724 A.2d 129; *DiFrisco III, supra,* 142 N.J. at 171, 662 A.2d 442; *Martini II, supra,* 139 N.J. at 28–29, 651 A.2d 949; *Bey IV, supra,* 137 N.J. at 350, 645 A.2d 685; *Marshall II, supra,* 130 N.J. at 173–74, 613 A.2d 1059.

### 1. *Salient–Factors Test*

"In the salient-factors test, we compare defendant's sentence to sentences in factually-similar cases in order to measure the relative frequency of defendant's sentence." *DiFrisco III, supra,* 142 N.J. at 172, 662 A.2d 442. In this test, we first categorize cases based on statutory aggravating factors, and then further subdivide the group " 'according to circumstances that serve either to aggravate or to mitigate the blameworthiness of the defendants in those cases.' " *Loftin II, supra,* 157 N.J. at 328, 724 A.2d 129 (quoting *Martini II, supra,* 139 N.J. at 33, 651 A.2d 949). The test is designed to determine the relative likelihood that a defendant committing a certain type of crime in a particular manner will receive the death penalty. Because the salient-factors test utilizes factually similar cases as a basis for comparison, we

have "consistently viewed [this test] as the most persuasive of the frequency tests." *Ibid.; see also DiFrisco III, supra,* 142 *N.J.* at 173, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 33, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 353, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 168, 613 *A.*2d 1059.

Chew is categorized as a pecuniary-motive killer. *Chew/Copper/Harvey Report,* tbl. 7A. The pecuniary-motive category is further divided into four subcategories: I–1, "a contract killing with defendant the killer;" I–2, "a contract killing with defendant the principal;" I–3, "defendant's motive was to obtain a pecuniary advantage (*e.g.,* inheritance) occurring as a matter of law upon the victim's death;" and I–4, "the victim paid the defendant to kill him or her." *Id.,* tbl. 6. The AOC has classified Chew as an I–3 killer. *Id.,* tbl. 7A. Excluding Walter Williams from the I–3 subcategory, *see supra* at 199, 731 *A.*2d at 1078, only one other defendant, Celestine Payne, remains. For this reason, any statistical analysis that considered only the I–3 subcategory would be unproductive. Accordingly, we will compare defendant with the entire group of pecuniary-motive killers. *See, e.g., DiFrisco III, supra,* 142 *N.J.* at 174, 662 *A.*2d 442 (comparing DiFrisco, a pecuniary-motive category, contract-killer subcategory, murderer to the entire category of pecuniary-motive murderers).[4]

Of the sixteen eligible I category cases, nine proceeded to the penalty-trial stage, and of the nine penalty-trial cases, five resulted in death sentences, including defendant's case. The death-sentencing rate for all death-eligible pecuniary-motive killers is thirty-one percent, and the death-sentencing rate for those advancing to the penalty-trial stage is fifty-five percent. These rates

---

[4] Our dissenting colleague continues to argue that "inheritance killings or killings for insurance proceeds—specifically, non-contract murders—are not "pecuniary" within the meaning of the death penalty statute." *Post* at 255, 731 *A.*2d at 1109. In *Chew I,* 150 *N.J.* at 50–57, 695 *A.*2d 1301, we explained that insurance or inheritance motivated killings are properly included within the "pecuniary gain" aggravating factor, *N.J.S.A.* 2C:11–3 c(4)(d). We will not repeat that discussion here.

are considerably higher than the overall death-sentencing rates of twelve percent for all death-eligible killers and thirty-one percent for all penalty-phase cases. Removing defendant's case from the group lowers the rates somewhat, but when we look at the overall death-sentencing rates without defendant there is no discernable difference.

In tabular form, the figures are:

Death–Sentencing Rates for
All Pecuniary–Motive Killers
(Data adjusted* from
Chew/Cooper/Harvey Report, tbl. 7).

| | Death–Sentencing Rate at Penalty Trial | Death–Sentencing Rate for All Eligible Cases | Proportion of Cases Advancing to P–Trial |
|---|---|---|---|
| I Incl. D | .55(⁶⁄₉) | .31 (⁵⁄₁₆) | .56 (⁹⁄₁₆) |
| I Excl. D | .50(⅝) | .27 (⁴⁄₁₅) | .53 (⁸⁄₁₅) |
| All Ds | .31 (⁵²⁄₁₆₃) | .12 (⁵²⁄₄₀₁) | .41 (¹⁶³⁄₄₀₁) |
| All Ds but D | .30 (⁴⁹⁄₁₆₂) | .12 (¹⁹⁄₄₀₀) | .41 (¹⁶²⁄₄₀₀) |

* The data has been adjusted to reflect the exclusion of Williams and Rose. See supra at —— (slip op. at 18).

---

We observe that the death penalty is imposed more frequently in the pecuniary-motive category than in the general death-eligible and penalty-phase groups, and that juries regularly find pecuniary motive killers to be deathworthy.

"While we are mindful that the small sample sizes prevent us from relying on the results of this test," *Loftin II, supra,* 157 *N.J.* at 329, 724 *A.*2d 129, because a significant proportion of defendants in the pecuniary-motive category have received the death penalty, we conclude that the test does not demonstrate disproportionality.

## 2. *Index–of–Outcomes Test*

The index-of-outcomes test " 'compare[s] cases that are factually dissimilar but that are nevertheless comparable from the

perspective of the defendants' blameworthiness.'" *Id.* at 330, 724 A.2d 129 (quoting *Martini II, supra,* 139 *N.J.* at 42, 651 A.2d 949). "Unlike the other tests, the basis for comparison here is not similar factual patterns or numerical indices but 'a roughly-equivalent measure of blameworthiness.'" *Martini II, supra,* 139 *N.J.* at 42, 651 A.2d 949 (quoting *Marshall II, supra,* 130 *N.J.* at 172, 613 A.2d 1059). "We compare the blameworthiness of different defendants by the statistically-relevant measures of culpability found in the circumstances of their cases." *Ibid.; see also Bey IV, supra,* 137 *N.J.* at 362, 645 A.2d 685. By this approach, we attempt to weigh statutory and nonstatutory, aggravating and mitigating "factors according to the influence each carries with prosecutors and jurors." *DiFrisco III, supra,* 142 *N.J.* at 178, 662 A.2d 442.

In conducting the index-of-outcomes test, we can use two different sets of data for the culpability estimates of prior defendants. In *Martini II, supra,* 139 *N.J.* at 45, 651 A.2d 949, we utilized the data compiled in each prior defendant's AOC report for the culpability estimates of that defendant. Since *Martini II,* however, we have utilized the data compiled by the AOC in its most recent report. *See Loftin II, supra,* 157 *N.J.* at 331–34, 724 A.2d 129; *DiFrisco III, supra,* 142 *N.J.* at 180–82, 662 A.2d 442. Although an individual defendant's culpability measures may vary slightly from report to report, utilizing the data in the *Chew/Cooper/Harvey Report* will enable us to assess Chew's culpability relative to other death-sentenced defendants based on the most recent estimates. *See Loftin II, supra,* 157 *N.J.* at 289, 724 A.2d 129 (stating "[a]s a matter of general principle, the broadest possible statistical database should provide the most useful information"). While the variations in the reports over this relatively short period of time do not alter the results of our analyses, they do contribute to our growing concern regarding the usefulness of the index-of-outcomes test. Nevertheless, as indicated *supra* at 201–02, 731 A.2d at 1079–80, we will continue to employ the test in its present form until we complete our review of the Special Master's findings and recommendations.

The *Chew/Cooper/Harvey Report* contains tables prepared by the AOC that are based on multivariate models [5] that measure the defendants' culpability. *Chew/Cooper/Harvey Report*, technical app. 9 at 1. The cases are placed into five levels of culpability, based on the predicted probability for each defendant that a jury would return a sentence of death. Those culpability levels are: level one, less than a twenty percent likelihood of a death sentence being returned; level two, twenty to less-than-forty percent; level three, forty to less-than-sixty percent; level four, sixty to less-than-eighty percent; and, level five, eighty to one hundred percent. Cases involving similar levels of blameworthiness are thereby grouped together for comparison purposes. *DiFrisco III, supra,* 142 *N.J.* at 179, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 42–43, 651 *A.*2d 949.

As in our prior proportionality review cases, the AOC urges caution in relying on the results of these analyses, stating that "the addition of cases over time has had a positive impact on the stability of the models, [but] the culpability estimate which purports to give a 'predicted probability of a death sentence' is often still too soft, and little substantive reliance should be given to this statistic in the *Chew, Cooper,* and *Harvey* cases." *Barraco Memorandum, supra,* at 4; *see also Loftin II, supra,* 157 *N.J.* at 330, 724 *A.*2d 129. We therefore once again must " 'treat the index-of-outcomes findings accordingly.' " *DiFrisco III, supra,* 142 *N.J.* at 179, 662 *A.*2d 442 (quoting *Martini II, supra,* 139 *N.J.* at 43, 651 *A.*2d 949).

The results of the index-of-outcomes test in tabular form are as follows:

---

[5] Multivariate regression, otherwise also known as "multiple-regression analysis[,] is a statistical tool used to describe the relationship between one or more independent variables (*e.g.,* prior murder) and a dependent variable (*e.g.,* the death penalty)." *Loftin II, supra,* 157 *N.J.* at 295 n. 8, 724 *A.*2d 129 (citing David C. Baldus, *Death Penalty Proportionality Review Project, Final Report to the New Jersey Supreme Court* at 1.17 (Sept. 24, 1991)).

## INDEX–OF–OUTCOME TEST RESULTS
### (data from Chew/Cooper/Harvey Report, tbls. 13–14, 21–25)

| | Statutory & Nonstatutory Factors | | Statutory Factors Only | |
|---|---|---|---|---|
| | Penalty Trial | Death–Eligible | Penalty Trial | Death–Eligible |
| **Chew** | | | | |
| Predicted Probability of Death Sentence | .67 | .19 | .90 | .47 |
| Range | (.22 to .94) | (.02 to .72) | (.51 to .99) | (.09 to .88) |
| Culpability Level | 4 | 1 | 5 | 3 |
| Death–Sentencing Rate | .75 (9/12) | .05 (18/334) | .76 (13/17) | .52 (9/17) |
| **Loftin** | | | | |
| Predicted Probability of Death Sentence | .21 | .44 | .72 | .53 |
| Range | (.01 to .92) | (.12 to .83) | (.26 to .95) | (.17 to .85) |
| Culpability Level | 2 | 3 | 4 | 3 |
| Death–Sentencing Rate | .26 (6/23) | .55 (6/11) | .63 (12/19) | .52 (9/17) |
| **DiFrisco** | | | | |
| Predicted Probability of Death Sentence | .68 | .19 | .46 | .19 |
| Range | (.24 to .93) | (.02 to .78) | (.08 to .89) | (.01 to .84) |
| Culpability Level | 4 | 1 | 3 | 1 |
| Death–Sentencing Rate | .75 (9/12) | .05 (18/334) | .45 (13/29) | .05 (18/318) |
| **Martini** | | | | |
| Predicted Probability of Death Sentence | .81 | .09 | .26 | .12 |
| Range | (.36 to .97) | (.02 to .32) | (.09 to .55) | (.04 to .31) |
| Culpability Level | 5 | 1 | 2 | 1 |
| Death–Sentencing Rate | .77 (23/30) | .05 (18/334) | .31 (10/32) | .05 (18/318) |
| **Bey** | | | | |
| Predicted Probability of Death Sentence | .65 | .38 | .74 | .40 |
| Range | (.22 to .93) | (.12 to .74) | (.40 to .92) | (.18 to .68) |
| Culpability Level | 4 | 2 | 4 | 3 |
| Death–Sentencing Rate | .75 (9/12) | .33 (10/30) | .63 (12/19) | .52 (9/17) |
| **Marshall** | | | | |
| Predicted Probability of Death Sentence | .64 | .13 | .59 | .27 |
| Range | (.15 to .95) | (.00 to .87) | (.12 to .94) | (.03 to .82) |
| Culpability Level | 4 | 1 | 3 | 2 |
| Death–Sentencing Rate | .75 (9/12) | .05 (18/334) | .45 (13/29) | .26 (12/45) |

Considering both statutory and nonstatutory factors in penalty-trial cases, defendant has a sixty-seven percent predicted probability of receiving a death sentence, with a probability range of twenty-two percent to ninety-four percent. *Chew/Cooper/Harvey Report*, tbl. 22. The predicted probability of sixty-seven percent

places Chew in culpability level four. *Ibid.* The penalty-trial death sentencing rate at that culpability level is seventy-five percent ($9/12$). *Id.*, tbl. 21.

Utilizing the same factors and universe, a comparison between Chew and our prior proportionality review defendants reveals that Chew's rates are comparable to those of DiFrisco, Bey and Marshall, somewhat lower than those of Martini and far higher than those of Loftin. *Id.*, tbl. 22. These figures do not demonstrate that Chew's sentence is disproportionate.

Considering again both statutory and nonstatutory factors, but expanding the universe to all death-eligible cases, Chew has a death sentence predicted probability of nineteen percent, with a probability range of two percent to seventy-two percent. *Id.*, tbl. 14. That places defendant in culpability level one, *ibid.*, which has a death-sentencing rate of five percent ($18/334$), *id.*, tbl. 13. Although only five percent of defendants in culpability level one have received the death penalty, it is important to remember that the overall death-sentencing rate is just twelve percent ($50/401$). *Ibid.* Further, comparing Chew to previous proportionality review defendants shows that the predicted probability of a death sentence and the death-sentencing rates for Loftin and Bey are somewhat higher than defendant's, and that defendant's rates exceed those of Martini and Marshall and are substantially identical to those of DiFrisco. *Id.*, tbl. 14. This comparison also does not support a finding of disproportionality.

Considering only the statutory aggravating and mitigating factors, and limiting the universe to penalty-trial cases, defendant has a predicted probability of death of ninety percent, with a probability range of fifty-one percent to ninety-nine percent. *Id.*, tbl. 24. That places defendant in culpability level five, *ibid.*, which has a death-sentencing rate of seventy-six percent ($13/17$), *id.*, tbl. 23. Considering the statutory factors only, and using the same penalty-trial universe, Chew's probabilities exceed those of the other proportionality review defendants and do not support a finding of disproportionality. *Id.*, tbl. 24.

Finally, we look at defendant's case examining only the statutory factors, but using the entire death-eligible universe. Chew has a predicted probability of death of forty-seven percent, with a probability range of nine percent to eighty-eight percent. *Id.*, tbl. 25. That places defendant in culpability level three, which has a death-sentencing rate of fifty-two percent (%7). *Id.* at tbls. 23, 25. Chew's figures are substantially identical to those of Loftin, and exceed those of the other defendants. *Id.*, tbl. 25. Once again, we do not find disproportionality.

We are satisfied that the index-of-outcomes test does not indicate that Chew's sentence of death is aberrational. Nevertheless, we remain wary of this test. As in the previous proportionality review cases, " 'the small sample size of cases with similar levels of blameworthiness and the great ranges in the confidence intervals' [6] prevent us from relying on the results." *Loftin II, supra,* 157 *N.J.* at 295–96, 724 *A.*2d 129 (quoting *DiFrisco III, supra,* 142 *N.J.* at 182, 662 *A.*2d 442). Moreover, the variability of defendant's predicted probability of a death sentence further suggests that the index-of-outcomes test is flawed and that "we must continue to rely on precedent-seeking review." *Id.* at 334, 724 *A.*2d 129; *see also DiFrisco III, supra,* 142 *N.J.* at 183, 662 *A.*2d 442.

## C. *Precedent–Seeking Review*

 "The precedent-seeking approach, also referred to as comparative-culpability review, is the second component of proportionality review." *Loftin II, supra,* 157 *N.J.* at 335, 724 *A.*2d 129; *see also DiFrisco III, supra,* 142 *N.J.* at 183, 662 *A.*2d 442; *Martini*

---

[6] "When a quantity in a population is being estimated on the basis of a sample drawn from that population, the estimate is sometimes expressed in a range, called a confidence interval or probability range.... This means that we can be ninety-five percent certain that the true population average lies within that range." *Loftin II, supra,* 157 *N.J.* at 330–31, 724 *A.*2d 129. As we pointed out in *Loftin II,* when the probability of being sentenced to death ranges from a low percentage to a high percentage, the predicted probability number is not useful. *Id.* at 331, 724 *A.*2d 129.

*II, supra,* 139 *N.J.* at 46, 651 *A.*2d 949. Under this approach we examine death-eligible cases similar to defendant's case to determine whether his death sentence is aberrant when compared to the sentences received by defendants in those other cases. Identical results are not expected or required; " 'even in closely-similar cases . . . . [proportionality review] merely requires that the defendant was not singled out unfairly for capital punishment.' " *DiFrisco III, supra,* 142 *N.J.* at 184, 662 *A.*2d 442 (quoting *Martini II, supra,* 139 *N.J.* at 47, 651 *A.*2d 949); *see also Loftin II, supra,* 157 *N.J.* at 335, 724 *A.*2d 129.

### 1. *Relevant Factors*

█ In undertaking a precedent-seeking review we evaluate defendant's culpability by considering statutory and nonstatutory aggravating and mitigating factors that "are 'rooted in traditional sentencing guidelines, were clearly presented to the sentencing jury, and are likely to influence a jury's sentencing decision.' " *Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129 (quoting *Bey IV, supra,* 137 *N.J.* at 368, 645 *A.*2d 685). We recognize that even when a jury rejects a specific mitigating factor, it may nonetheless remain influenced by the evidence presented in support of that mitigating factor. *Ibid.; DiFrisco III, supra,* 142 *N.J.* at 185, 662 *A.*2d 442; *Bey IV, supra,* 137 *N.J.* at 368, 645 *A.*2d 685. We therefore include in our review of defendant's culpability, information that supports mitigating factors rejected by the jury.

█ In comparing defendant to other similar defendants, we use a three-part model of criminal culpability. *Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129; *DiFrisco III, supra,* 142 *N.J.* at 203, 662 *A.*2d 442, *Martini II, supra,* 139 *N.J.* at 74–75, 651 *A.*2d 949, *Bey IV, supra,* 137 *N.J.* at 366, 645 *A.*2d 685, *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059. We weigh the evidence focusing on the categories described in *Marshall II:* the defendant's moral blameworthiness, the degree of victimization, and the character of the defendant. 130 *N.J.* at 155, 613 *A.*2d 1059. We first review defendant's moral blameworthiness by examining

motive, premeditation, justification or excuse, evidence of mental disease, defect, or disturbance, knowledge of helplessness of the victim, knowledge of effects on nondecedent victims, defendant's age, maturity, etc., and defendant's involvement in planning the murder. *Ibid.* We then consider the degree of victimization, including the violence and brutality of the murder, and injury to nondecedent victims. *Ibid.* Finally, we examine the character of the defendant, including his or her prior record, other unrelated acts of violence, cooperation with authorities, remorse, and capacity for rehabilitation. *Ibid.*

### a. *Defendant's Moral Blameworthiness*

An analysis of defendant's blameworthiness reveals that he is highly blameworthy. Defendant's motive was pecuniary gain, that is, he killed Theresa Bowman to obtain $250,000 in insurance proceeds. Because defendant's comparison group is defined by his pecuniary motive, and because the precedent-seeking approach seeks to determine whether defendant's death sentence is disproportionate to the sentences meted out to others in his comparison group, we note only that pecuniary-motive defendants have generally been considered highly culpable. *See supra* at 204, 731 *A.2d* at 1081.

Moreover, in comparison to other pecuniary-motive murderers, the extent of Chew's premeditation and planning render him exceptionally blameworthy among the defendants in his group. In June 1991, over nineteen months before the murder, defendant asked his former employee to kill Ms. Bowman so that defendant could collect the insurance proceeds. Then, in December 1991, Chew told his son about his plan to murder his girlfriend. Finally, the unusual visit defendant made to his insurance agent's home approximately two weeks before Ms. Bowman was killed demonstrates the defendant's careful planning in the weeks leading up to the murder. His purpose was clear: to ensure that the policy would not lapse before he could take Theresa Bowman's life.

There is some equivocal evidence that Ms. Bowman provoked defendant at the time of the murder. Defendant told the police that Ms. Bowman scratched him, and a detective noted that defendant had scratches on his face. The AOC coded provocation as suggested but not certain.

Defendant did not seek to establish as a mitigating factor that he was mentally disturbed during his adulthood. Nine jurors, however, found that he suffered "serious mental and emotional disturbance as a youth, as was demonstrated by his numerous juvenile institutionalizations." In 1976, seventeen years before he killed Ms. Bowman, defendant was arrested for escaping from Marlboro Psychiatric Hospital where he had been sent for a psychiatric evaluation after having threatened to commit suicide while in prison. Defendant's childhood mental defects and his threats to commit suicide could suggest that he suffered from a mental disease at the time of the murder. Yet, these events occurred many years before his crime. Defendant failed to present direct testimony that he suffered from any mental illness when he murdered Ms. Bowman, and therefore this element carries little weight in our determination.

Although Ms. Bowman did not suffer from any ailment that rendered her inherently helpless, defendant killed her while she was trapped in the driver's seat of his Corvette. The driver's side door of defendant's car could not be opened from the inside, a fact defendant must have known when he entered the car from the passenger side, blocking Ms. Bowman's exit. Also, defendant was armed with a knife and Ms. Bowman was unarmed. This is a case in which the defendant took advantage of his victim's helpless position—that she was boxed in and did not have a weapon—to slit her throat.

There were no nondecedent victims present to aggravate defendant's moral blameworthiness. Yet, defendant had lived with Ms. Bowman for over four years and presumably knew family and friends who would be devastated by her death. Defendant was a mature adult of forty-one years when he carried out his plan to kill

Ms. Bowman and was fully capable of understanding the magnitude of his crime and its impact on others.

### b. *Degree of Victimization*

Defendant killed Ms. Bowman with a gaping knife wound that "extended from ear to ear and was deep enough to cut through the voice box and esophagus." She died from acute blood loss and was aware of what was happening to her. The wounds on her left hand suggest that she attempted to defend herself, and her screaming demonstrates that she experienced terror or intense pain or both. Because there were no other victims the degree of victimization, when compared to other defendants who killed in the presence of family members or other witnesses, is somewhat less.

### c. *Defendant's Character*

Defendant points out that, other than Ms. Bowman's murder, his only post–1977 conviction occurred in 1987 for possession of stolen property, and that before Ms. Bowman's murder he had never committed a violent crime. Although it is true that defendant was convicted only twice in the twenty years preceding the killing, his criminal record prior to that is extensive. In the 1970s, defendant had five fraud convictions, four involving forgery. He had also been convicted for passing a bad check, larceny and burglary, and escape. More important than his prior criminal history, in this case Chew did not cooperate with the authorities. He never admitted his guilt and his story changed each time he spoke to the police. He convinced his sister and her roommate to lie about where he was on the night of the murder and threatened them if they did not go along with his story. In short, he did his best to get others to coverup for him.

Prior to Ms. Bowman's murder, defendant appeared to have a strong capacity for rehabilitation. His multitude of convictions in the 1970s had been followed by only two convictions in twenty years. Yet, defendant has shown no remorse for his brutal crime. He has refused to take responsibility for Ms. Bowman's death,

unlike those defendants who have acknowledged their acts, thereby demonstrating some potential for rehabilitation.

Based on our three-part model of criminal culpability, we conclude that overall, defendant exhibits a high level of culpability.

### 2. *Defendant's Comparison Group*

Comparative-culpability analysis employs the same comparison group as that used in the salient-factors test. *See, e.g., DiFrisco III, supra,* 142 *N.J.* at 186, 662 *A.*2d 442 (using AOC's pecuniary-motive murderer category to form defendant's comparison group). By using the salient-factors comparison group for precedent-seeking review, the Court ensures that the two analyses are complementary and can confirm each other. *Id.* at 185, 662 *A.*2d 442 (stating "we limit the universe in precedent-seeking review to those cases ... used in frequency analysis .... so that the two prongs of proportionality review ... may thus be profitably compared"); *see also Martini II, supra,* 139 *N.J.* at 49, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 366–67, 645 *A.*2d 685. As noted earlier, the AOC placed defendant in the "I–3" subcategory, which consists of pecuniary-motive, noncontract killers (*Chew/Cooper/Harvey Report,* tbl. 7). *See supra* at 203, 731 *A.*2d at 1080. Because only one other defendant has been properly placed in this subcategory, *ibid.,* we have decided to compare defendant's case with all of the I category (pecuniary-motive) cases.

In comparing defendant's case to those of the other killers in his group, and in considering the totality of the evidence, we find that defendant's criminal culpability is high and his death sentence is not disproportionate. Defendant argues that his level of culpability is more like the life-sentenced cases in his comparison group than the death-sentenced cases; we reject that assertion and note that "[d]isparity alone does not demonstrate disproportionality." *Bey IV, supra,* 137 *N.J.* at 386, 645 *A.*2d 685. Rather, we " 'search ... for some impermissible or invidious factor or pattern that has been broken.' " *Ibid.* (quoting *Marshall II, supra,* 130

*N.J.* at 181, 613 *A.*2d 1059.) The fact that other defendants in comparable cases have been spared is not dispositive.

We will compare defendant first with the one other I–3 murderer, and then with the contract killers and the contract principals.

### 3. *Comparison of Similar Cases to Defendant's Case* [7]

Celestine Payne is the only other killer in the I–3 category. Unlike Chew, she pled guilty to various murder counts and was sentenced to life imprisonment with a thirty-year parole disqualifier and a consecutive twenty-year term for attempted murder. Yet, to some extent, the facts of their crimes are similar. Both killed persons close to them—Payne, her husband, and Chew, the woman with whom he lived—in order to collect life insurance proceeds. Both were forty-one years old when they committed the murders and both murders were highly premeditated. Yet, Payne killed her husband herself and hired someone else to kill two other people, although one of the attempts did not result in death; Chew murdered only one person. In this respect, Chew is less culpable than Payne.

When we examine the facts of each case, however, we see another difference between the two defendants that explains the difference in their sentences. Even though Chew had mental problems in his youth, he provided no direct evidence that he had suffered from mental instability in the eighteen years prior to the murder of Theresa Bowman. At the time Payne committed murder, she suffered from severe mental illness. She had a history of psychiatric problems and was suffering from depression and schizophrenia. She heard voices and was taking prescription medication for her psychiatric infirmity. When she expressed anger at her husband and even threatened to kill him, her medication was increased. Defendant seeks to minimize the sig-

---

[7] Summaries of the I cases are provided in Appendix A. They are based on published opinions, and on the discussions of the cases found in the AOC's Detailed Narrative Summaries.

nificance of Payne's illness in relation to her life sentence, but there is ample evidence to suggest that her condition was relevant. In our view, Payne's depression, schizophrenia and delusions distinguish her life sentence from Chew's sentence of death. For this reason, when we compare defendant to Payne, we do not find that " 'defendant was ... singled out unfairly for capital punishment.' " *DiFrisco III, supra,* 142 *N.J.* at 184, 662 *A.2d* 442 (quoting *Martini II, supra,* 139 *N.J.* at 47, 651 *A.2d* 949).

Comparing Chew to the contract killers in the I–1 category also does not demonstrate disproportionality. In each of the I–1 cases, the defendant's motivation was similar to that of Chew: the expectation of receiving something of pecuniary value. These cases are nonetheless distinguishable from Chew's case because, with the exception of James Clausell (who was initially sentenced to death), each of the defendants in the I–1 category presented evidence of either mental disease, defect or disturbance, or that he substantially assisted the State or in some other manner cooperated with the authorities, or both. *See id.* at 209, 662 *A.2d* 442 (distinguishing comparison defendants based on "some form of organic brain disease or mental disorder," or "substantial assistance in the prosecution and conviction of their hirers"). Thus, Burroughs, Harris, Irizarry, Melendez and Pinchom cooperated with the State or substantially assisted the State in the prosecution of someone else, and Harris and Melendez presented evidence of mental disease, defect or disturbance as well.

When confronted by the authorities, Burroughs readily admitted to killing Arthur Brand, implicated the man who paid him to do the killing, and revealed the location of the murder weapon. Although he killed for money, Burroughs had the additional and less culpable motive of assisting a friend remove an abusive and drug-dealing family member. Irizarry similarly assisted the State in the prosecution of his contract principal. He chose to testify against the man who hired him even without a promise from the State not to prosecute him capitally. Harris was injured in a motorcycle accident and needed daily medication to overcome the

pain of his recurring headaches. He suffered from a mental disease or defect that impaired his mental capacity. And, unlike Chew, Harris was, for the most part, cooperative when the police confronted him (he placed himself at the scene and admitted the gun was his). Melendez killed his victim for money and to demonstrate loyalty and friendship. When arrested, he acknowledged that he had committed the murder and immediately told the police who had hired him. He also presented expert testimony that he was borderline mentally retarded, with an IQ of 70. Pinchom readily confessed to his crimes, and as part of his plea agreement, said that he would cooperate with the State in the prosecution of his principal and other codefendants.

In contrast to the I–1 killers who did not receive death sentences, Chew deceived the authorities, solicited the assistance of others in concealing his crime, and continues to profess his innocence. Moreover, in comparing Chew with Clausell and DiFrisco, we see that Chew's culpability more closely resembles or is greater than that of the two I–1 killers who received sentences of death. DiFrisco killed a man he did not know in exchange for $2500 and the cancellation of a $500 drug debt. He did not plan his crime over a period of many months and his victim died instantly. Later, he confessed to the killing, and implicated Franciotti, the hirer. Although his cooperation was sporadic, six jurors found the c(5)(g), substantial assistance to the State, mitigating factor. Chew, on the other hand, committed a premeditated murder in which he slashed the throat of a woman with whom he had had a long-term relationship, and then denied and tried to cover up the killing. Both men presented similar mitigating evidence concerning troubled childhoods, including a lack of parental attention and love, and low self-esteem. DiFrisco was twice sentenced to death.

Clausell agreed to kill Edward Atwood for $2,000 and, a few days later, shot Atwood at his home. Although Clausell's crime was premeditated, when we compare the events leading up to both the Clausell and Chew murders we see that Chew planned the

murder of Ms. Bowman for over a year prior to the crime. We also see that Chew at first denied his involvement in the murder and asked his sister and her roommate to lie for him, and that Clausell engaged in no such deception. Clausell's victim died as the result of a gunshot wound; Chew's victim was trapped in Chew's car, struggled for her life, and had her throat slashed. Unlike Chew, Clausell did not have a significant criminal history and did not initiate the murder of Atwood. Although Clausell killed in the presence of his victim's family, endangering the victim's young daughter, our review of the record convinces us that Chew is at least as culpable as Clausell who was initially sentenced to death.

When Chew's case is compared to the contract principals, we find that "[t]he totality of the evidence ... leads us [again] to conclude that [Chew's] death sentence is not disproportionate." *Bey IV, supra,* 137 *N.J.* at 382, 645 *A.*2d 685. First, none of the defendants in this category killed solely for pecuniary gain.[8] Brand paid to rid his family of an abusive brother, the Engel brothers planned the death of William's ex-wife out of a warped sense of jealousy and resentment, and Marshall had his wife killed in order to eradicate an obstacle to his extramarital romance. More important, however, the juries in the cases of both Brand and the Engels—the two cases in the contract principal group where a death sentence was not imposed—specifically found mitigating factor c(5)(a), influence of extreme mental or emotional disturbance. Also, although Brand continues to profess his innocence, he had no prior record and expressed remorse over his brother's death.

The level of depravity and callousness of the Engels' killing renders the brothers highly culpable. The Engels arranged to

---

[8] The dissent correctly observes that Chew's "motivation in part for killing Bowman ... was because she was leaving him," *post* at 266, 731 *A.*2d at 1115, not however, because Chew cared for Bowman, as suggested by the dissent, but because Chew would lose the opportunity to collect insurance proceeds on her life.

have William's ex-wife Xiomara killed because William apparently could not accept the end of their relationship. As William's paid assassin strangled Xiomara, William smoked a cigarette and called his ex-wife a "bitch." Both William and Herbert deceived the police, and William attempted to use the victim's unwitting mother as part of his alibi. Chew planned to kill Theresa Bowman long before she decided to leave him. He carried out his bloody plot alone and killed only for monetary gain. Yet, these differences cannot explain why Chew was sentenced to death and the Engels, who committed an utterly reprehensible murder received life. Perhaps the mitigating evidence offered by the Engels convinced the jury to spare them. The brothers had no prior criminal record. Each had three children and William was a successful businessman involved in many charities. We know, also, that their elderly father testified about the murder of his own father in a Nazi concentration camp during World War II. The Engels' jury found extreme mental or emotional distress, and that the brothers experienced duress. As we said in *Marshall II, supra*, 130 *N.J.* at 181, 613 *A.*2d 1059, "[t]hat the Engel brothers were spared their lives does not establish a pattern of life-sentencing for such killings."

Finally, we compare the facts of Chew's murder to those in the case of Robert Marshall, a case in many ways similar to defendant's. Marshall had his wife killed, and Chew killed the woman with whom he was living, both for life insurance proceeds. Neither man offered substantial assistance to the State, and neither was mentally disturbed at the time of the murder. Both men devised elaborate schemes to accomplish their objectives, and both engaged in premeditation for long periods of time, Marshall from December 1983 until the killing in 1984, and Chew from as early as 1991 until Bowman's murder in 1993. Marshall's wife, however, died instantly from gunshot wounds; Ms. Bowman's throat was cut from ear to ear, an agonizing death. Moreover, Chew killed solely for pecuniary gain, whereas Marshall killed for money and to be with his paramour. Although defendant points to his abusive childhood in order to differentiate himself from Marshall,

220

this fact cannot overcome the more blameworthy aspects of his case.

Our precedent-seeking review does not show that Chew's death sentence is disproportionate. Not only are pecuniary-motive murderers among the most culpable of murderers as a group, but within this group, defendant ranks high in culpability. In sum, unlike many of the life-sentenced pecuniary-motive murderers, Chew did not substantially assist the State and was not mentally disturbed when he murdered his victim. He contemplated Ms. Bowman's death for over a year and refuses to accept responsibility for his crime. By asking his sister and her roommate to lie about his whereabouts on the night of the murder, Chew obstructed justice. And, finally, the way he killed his victim, although relatively quick, was particularly brutal. Because defendant compares unfavorably with most pecuniary-motive murderers, both those who were sentenced to death and those who were not, his death sentence is justified.

## IV

### *Other Arguments*

Defendant claims that the death penalty is imposed in a racially discriminatory manner; that mentally-ill defendants are more likely to be capitally prosecuted and are therefore subject to cruel and unusual punishment and denied equal protection of the law guaranteed by both the United States Constitution and the New Jersey Constitution; that because death sentences are not generally imposed for the crime of capital murder, imposing the death penalty on him also violates the United States Constitution and the New Jersey Constitution; and that the geographic distribution of capital charging and sentencing decisions shows the death penalty is being applied inconsistently, unfairly and arbitrarily, again in violation of the federal and state constitutions. The latter two claims have been considered and rejected previously by the Court, and we reject them without further discussion. *See Loftin II, supra,* 157 *N.J.* at 345, 724 *A.*2d 129; *DiFrisco III, supra,* 142

N.J. at 210, 662 A.2d 442; *Martini II, supra,* 139 N.J. at 79–80, 651 A.2d 949; *Bey IV, supra,* 137 N.J. at 396, 645 A.2d 685; *Marshall II, supra,* 130 N.J. at 188–215, 613 A.2d 1059. We now consider the first two claims.

## A. *Racial Bias in the Administration of the Death Penalty*

In *Loftin II,* we reaffirmed our commitment to monitoring the imposition of the death penalty in order to determine whether impermissible racial discrimination is "present in the capital sentencing system." 157 N.J. at 276, 724 A.2d 129; *see also Marshall II, supra,* 130 N.J. at 207–08, 613 A.2d 1059. We will not retreat from that commitment. If we are presented with a record in which the statistical evidence relentlessly documents the risk that a defendant's sentence has been influenced by racial considerations, we will " 'seek corrective measures, and if that fail[s] we [will] not, consistent with our State's policy, tolerate discrimination that threaten[s] the foundation of our system of law.' " *Loftin II, supra,* 157 N.J. at 298, 724 A.2d 129 (quoting *Marshall II, supra,* 130 N.J. at 209, 613 A.2d 1059).

Because in *Loftin II* the statistical models used by the AOC to measure race effect in capital sentencing "show[ed] statistical significance in five of ... six categories," *id.* at 301, 724 A.2d 129, Loftin claimed that there was "strong evidence that race is a predictor of the outcome of a penalty trial." *Id.* at 302, 724 A.2d 129. At the same time, the State strongly contested "the accuracy and reliability of the statistical models." *Ibid.* In order to learn more about the model results, and to understand whether racial considerations influence sentencing decisions, we appointed retired Superior Court Judge Richard S. Cohen as Special Master to "conduct a review, perform analyses, and make findings and recommendations relating to defendants' race as a possible factor in the decision of juries to impose the death penalty." *State v. Loftin,* No. A–86–96, slip op. at 3 (Oct. 22, 1996).

Judge Cohen did not find that Loftin had demonstrated " 'relentless documentation or even a preponderance in the direction of the existence of any racial bias.' " *Loftin II, supra,* 157 N.J. at

314, 724 *A*.2d 129 (quoting Richard S. Cohen & Dr. John W. Tukey, *A Study of Statistical Evidence of Race Bias in Penalty Trials* 12 (May 4, 1997) (*Supplemental Report*)). Moreover, in the course of his review, he raised more questions than he was able to answer in the short time available to him. The Court accepted his conclusion that racial disparity had not been shown in Loftin's case, *id.* at 316, 724 *A*.2d 129, and sought further assistance from a new Special Master in developing improved statistical models capable of providing more reliable information about race effect, *id.* at 315, 724 *A*.2d 129. We determined, as indicated earlier, that until we have reviewed the new Special Master's report, we will conduct our proportionality review essentially as before. *Id.* at 266, 724 *A*.2d 129.

We observe that the model results in Chew's case are very like Loftin's. As the table below indicates, the observed significance of four of six variables falls at or below five percent, the threshold commonly used to identify statistical significance.[9]

| Variable | Schedule | Coefficient | Observed sig. (p-value) |
|---|---|---|---|
| whitvic | 2 | 1.2922(1.3555) | .0434(.0412) |
| blackd | 2 | 1.1758(1.4522) | .0376(.0171) |
| whitvic | 5 | 0.9114(0.5157) | .2490(.5535) |
| blackd | 5 | 1.8423(2.3796) | .0169(.0066) |
| whitvic | 8 | 1.0517(1.0699) | .0234(.0240) |
| blackd | 8 | 0.7791(0.9520) | .0834(.0418) |

[Memorandum from David Weisburd, AOC statistical consultant, to Joseph Barraco, AOC staff-member, "Proportionality Review" 2 (Dec. 3, 1997)(Weisburd Memorandum) (on file with the AOC) (Loftin Report data in parentheses).]

---

[9] Statisticians use the term "statistically significant" to refer to statistical findings which "chance, acting alone, probably would not have caused." *Loftin II, supra*, 157 *N.J.* at 301 n. 11, 724 *A*.2d 129 (quoting John M. Conley & David W. Peterson, *The Science of Gatekeeping: The Federal Judicial Center's New Reference Manual on Scientific Evidence*, 74 *N.C. L.Rev.* 1183, 1209 n. 159 (1996)). The probability of a relationship occurring by chance is generally stated as a "p-value." A p-value of less than .05 (a one-in-twenty probability that the relationship would have occurred by chance alone), is considered statistically significant and therefore useful in a variety of research contexts. *Ibid.*

The AOC consultant compared the results set forth in the *Chew/Cooper/Harvey Report,* to those in the *Loftin Report* and concluded that he could "not find major differences in the impacts of race across the schedules ... when comparing this proportionality review to Loftin." *Weisburd Memorandum,* at 1–2. Because the statistical models have changed little from *Loftin II* to *Chew II,* and because of the serious flaws in the models used by the AOC, *Loftin II, supra,* 157 *N.J.* at 310–11, 724 *A.*2d 129, we are unable to rely on the results in either case to find "racial disparity in the imposition of the death penalty," *id.* at 315, 724 *A.*2d 129, based on the models.

Defendant asks us to "refine the burden of proof" such that even the flawed results in the models are considered sufficient to demonstrate that the New Jersey capital sentencing system is discriminatory. In *Loftin II,* we considered and rejected the same request. *Id.* at 314–15, 724 *A.*2d 129 (concluding that defendant must " 'relentlessly document[ ] the risk' of racial disparity" before we would overturn his death sentence) (quoting *Marshall II, supra,* 130 *N.J.* at 213, 613 *A.*2d 1059).

The record here does not sustain a claim of impermissible bias.

## B. *Extreme Mental or Emotional Disturbance Mitigating Factor*

 Defendant argues that the death penalty is unconstitutional because defendants found to possess the c(5)(a) extreme mental or emotional disturbance mitigating factor are more likely to be prosecuted capitally and sentenced to death than defendants who do not suffer from extreme mental or emotional disturbance. Defendant asserts that this factor is common in capital cases, and that it actually functions as an aggravating factor, increasing the

risk of proceeding to a penalty phase and increasing the likelihood of receiving a death sentence.

The data do not support this claim.

### C(5)(A) Mitigating Factor
### (data from Chew/Cooper/Harvey Report, tbl. 7, 10)

| | Death–Sentencing Rate At Penalty Trial | Death–Sentencing Rate for All Eligible Cases | Proportion of Cases Advancing to P-Trial |
|---|---|---|---|
| Cases with the c(5)(a) factor | 27% ($\frac{20}{73}$) | 15% ($\frac{20}{131}$) | 56% ($\frac{73}{131}$) |
| All Ds | 31% ($\frac{50}{163}$) | 12% ($\frac{50}{401}$) | 41% ($\frac{163}{401}$) |

We can see from the combined table that the c(5)(a) factor is not uncommon among capital defendants: thirty-three percent ($\frac{131}{401}$) of all death-eligible defendants and forty-five percent ($\frac{73}{163}$) of all penalty-phase defendants were found to possess the characteristic. More specifically, the table shows that thirty-one percent ($\frac{50}{163}$) of all penalty-phase defendants have received death sentences and twenty-seven percent ($\frac{20}{73}$) of defendants possessing the c(5)(a) factor have been sentenced to death; that twelve percent ($\frac{50}{401}$) of all death-eligible defendants have received death sentences and fifteen percent ($\frac{20}{131}$) of defendants possessing the c(5)(a) factor have been sentenced to death; and, that forty-one percent ($\frac{163}{401}$) of all death-eligible defendants have advanced to the penalty phase and fifty-six percent ($\frac{73}{131}$) of the defendants possessing the c(5)(a) factor have been sentenced to death. These data show a higher proportion of death eligible defendants with the c(5)(a) mitigating factor advancing to the penalty phase than the general universe, and a roughly equivalent proportion in each category receiving the death penalty. This mixed result does suggest that defendants who are extremely disturbed appear with some frequency in our capital sentencing system. It does not inform us about the reasons this is so, or that the c(5)(a) factor is operating improperly.

Defendant also points to the four regressions supporting the index-of-outcomes test wherein it is suggested that the c(5)(a) mitigating factor correlates positively with incidence of the death penalty. However, this correlation is considered statistically significant only if associated with a p-value of 0.05 or less. *See supra* at 222 n. 9, 731 *A*.2d at 1091 n. 9. As the table below illustrates, the p-values associated with these data range from .5539 to .7497, and are not statistically significant.

C(5)(A) Mitigating Factor—Correlation with Death Sentence
(data from *Chew/Cooper/Harvey Report*, Tech
App. 10 Schls. 3, 6, 9, 12.)

| | Death–Eligible | | Penalty Trial | |
|---|---|---|---|---|
| | Statutory & Nonstatutory | Statutory Only | Statutory & Nonstatutory | Statutory Only |
| P-value | 0.5539 | 0.6621 | 0.7497 | 0.6491 |

Defendant's experts present their own statistical studies in an effort to demonstrate that defendants possessing the c(5)(a) factor are prosecuted capitally at a significantly higher rate than defendants who do not possess this factor. Although defendant's models show a positive correlation between the mental disturbance factor and capital prosecution, the schedules on which the defendant primarily relies bear the warning, "the validity of the model fit is questionable." This means that the defendant's statistics may reflect a flaw in the way that the data was accumulated, grouped, or analyzed. That these models are flawed is also evident from the other correlations purportedly derived from them. By way of example, according to defendant's models the c(5)(g) substantial assistance to the State mitigating factor also functions as an aggravating factor. This anomalous result—that helping the State increases the likelihood of a capital prosecution—in itself throws into question the validity of defendant's models.

There is another compelling reason, however, that it is unlikely prosecutors discriminate against defendants possessing the c(5)(a)

mitigating factor when making capital prosecution decisions. At the time of the decision, prosecutors are generally unaware whether a defendant intends to assert c(5)(a) mitigating evidence. Because the c(5)(a) mitigating factor applies to an "extreme mental or emotional disturbance insufficient to constitute a defense to prosecution," the c(5)(a) factor is not a defense, and defendants are not obligated to serve notice on the prosecutor that they intend to rely on this factor at trial. *R.* 3:12–1. And, because defendants may rely on extreme disturbance even in the absence of any evidence of mental problems, a prosecutor may be unaware of the defendant's intent to rely on this factor when the decision to prosecute capitally is made. That prosecutors often do not know that a defendant intends to rely on the c(5)(a) factor, negates the defendant's claim that prosecutors are discriminating against defendants possessing the extreme emotional or mental mitigating factor when making decisions about whether to seek the death penalty. For these reasons, we do not find that defendants exhibiting extreme mental or emotional disturbance are more likely to be capitally prosecuted than other defendants.

## V

### *Conclusion*

Chew has not demonstrated that his death sentence is disproportionate; nor has he met his burden of proving that racial bias or mental disturbance operated as impermissible factors in New Jersey's death sentencing system.

Defendant's sentence of death is affirmed.

## *APPENDIX A*

### I. *Pecuniary Motive Other Pecuniary Advantage: I–3*

#### A) *Celestine Payne 1*

During the investigation of another murder committed by Celestine Payne, the police became suspicious of the circumstances

surrounding the death of her husband. Further investigation revealed that Payne had asked Eugene Cooper to fatally shoot her husband but that Cooper declined. Later, Payne's husband died in his bed and Cooper, Payne, and Payne's children placed the victim in a box and put the box next to a road.

Because she had regularly threatened to poison her husband, Cooper assumed that Payne had carried out her threats. Payne's daughter, Wendy, also believed her mother killed the victim because Payne often put medicine in her husband's food and told the children not to eat or drink it. Wendy guessed that her mother killed the victim in order to collect life insurance proceeds because the family was in danger of losing their home.

Payne collected $49,000 in life insurance after the death of her husband. An autopsy revealed that the victim had died of a mix of antianxiety and antidepressant prescription drugs. Notably, although the victim did not suffer from depression, the drugs that caused the victim's death matched the Celestine Payne's prescribed medication.

At the time of the murder, Payne was a forty-one-year-old mother of four children. She had graduated from high school, but read and wrote poorly and had last worked ten years earlier as a bookbinder. Payne had a history of psychiatric problems and had been under psychiatric care for approximately two years. In August 1987, she complained that she was depressed and heard voices. She was diagnosed with schizophrenia and was given prescription medication. Her dosage was increased after she expressed anger toward her husband and threatened to kill him. By June of 1988, Payne was experiencing auditory hallucinations and was paranoid at times.

Payne had no prior convictions. After she murdered her husband, however, she took out life insurance policies on behalf of two other individuals and arranged for Charles Pinchom to kill both of them. Pinchom killed one victim, but his stabbing of the other did not result in that victim's death.

Charged with, *inter alia*, two counts of murder and conspiracy to commit murder, one count of attempted murder, and various other charges, Celestine Payne pled guilty to all charges on May 28, 1997. On each murder conviction, the court sentenced her concurrently to life imprisonment with a thirty-year parole disqualifier. On the attempted murder conviction she was sentenced to a consecutive twenty-year prison term.

The AOC coded as present the c(4)(d), pecuniary-motive, aggravating factor and mitigating factors c(5)(d), diminished capacity; c(5)(f), no significant criminal history; and c(5)(h), the catchall mitigating factor.

## II. *Pecuniary–Motive Contract Killers: I–1*

### A) *Randy Burroughs*

In 1988, Francis Brand began asking Randy Burroughs, a longtime high school friend, to kill Brand's brother Arthur. Arthur had abused his family for many years and sold drugs to children, including his brother, Joey Brand. Because of Arthur's behavior, Francis was both very angry at Arthur and very afraid of him.

Burroughs testified that Francis regularly appealed to him to kill Arthur, and had in fact implored at least two others to do so as well. Francis initially offered $350, but later offered $1700 and then $2000 for his brother's death. Burroughs's motive in killing Arthur was thus twofold: to assist Francis in ridding the family of an abusive and hostile brother and to obtain monetary payment.

In October of 1988, Burroughs agreed to kill Arthur, but "chickened out." Instead, Burroughs fired a gun at a wall inside the Brand house. On July 4, 1989, while attempting to break up a fight between the Brand brothers, Burroughs became engaged in an altercation with Arthur. On July 11, 1989, Burroughs entered the Brand residence at 3:00 a.m. and opened Arthur's bedroom door. Arthur awoke and Burroughs said, "You got to stop hurting

people." He then exclaimed, "You're done!" Burroughs shot Arthur twice with a shotgun and killed him.

Burroughs returned to the crime scene later on the night of the murder and told the investigating police officers that he had left his hat in the house during the prior day. He met with Francis that night and the next day, but did not discuss a payment. When the police interrogated him, Burroughs admitted to killing Arthur, implicated Francis, and revealed that the murder weapon was in the Brands' attic.

Although Burroughs was placed in special-education classes, he graduated from high school. He held several jobs, but was never employed more than six months. He was single and had fathered three children with three different women. He had no history of drug abuse and had never been institutionalized. He had a prior conviction for making terroristic threats, and received a fine but no probation or incarceration for the offense.

A grand jury charged Burroughs with conspiracy, murder, felony murder, burglary, and possession of a weapon for unlawful purposes. Burroughs pled guilty to murder, and the other charges were dismissed. The court sentenced Burroughs to thirty years in prison without parole. He later served as a prosecution witness in the trial of Francis Brand.

The AOC coded as present aggravating factor c(4)(d), pecuniary motive, and mitigating factors c(5)(e), duress; c(5)(f), no significant criminal history; c(5)(g), substantial assistance to the State; and the c(5)(h) catchall mitigating factor.

### B) *James Clausell 1A and 1B*

Edward Atwood, the victim, filed a municipal complaint against his neighbor, Roland Bartlett, for intentional cruelty. The complaint alleged Bartlett failed to provide water to his dog and did not timely remove feces from the dog's kennel. Bartlett was acquitted of the former charge but fined for the latter. Subsequently, Anthony Bartlett, Roland's son, offered Paul Grant, code-

fendant Dwayne Wright's friend, $5000 to kill "someone." Grant refused and later testified that Clausell and Wright agreed to murder Atwood for $2000 each.

On August 12, 1984, Clausell was paged. After placing a call, Clausell told Wright: "Tonight's the night.... We have to do it." Wright then asked Clausell to "get the gun," and Clausell retrieved a .357 magnum from his house. At 10:45 p.m., Clausell and Wright went to Atwood's house, where they were told by Atwood's wife that he was not home. When Atwood returned shortly after midnight, Clausell and Wright knocked on the door. Atwood's wife, daughter, and grandparents were in close proximity as Atwood opened the door. His son was at the top of the stairs. After a short verbal exchange, Clausell fired two shots. The first bullet killed Atwood and the second narrowly missed Atwood's daughter. Clausell and Wright left the Atwood home and went to a club purportedly owned by Bartlett where they expected to get paid.

Clausell was twenty-one years old when he murdered Atwood. He admitted that, at the time of the murder, he regularly sold drugs. Clausell also admitted that he had an $800–per–day cocaine addiction and had experimented with a variety of other drugs throughout the eight years preceding the murder. At the time of his arrest, Clausell had no prior convictions although he was facing a pending charge for his involvement in a nonfatal shooting. As a child, Clausell suffered a head injury that caused severe headaches. He later injured his head again when playing high school football.

A grand jury indicted Clausell and Wright of own-conduct purposeful-or-knowing murder, conspiracy to commit murder, five counts of aggravated assault, possession of a weapon for an unlawful purpose, and possession of a handgun without a permit. The court dismissed the conspiracy count, and a jury convicted Clausell of the other charges except for two of the five counts of aggravated assault. The jury convicted Wright of the same

offenses, but found that Wright did not kill by his own conduct. Wright received a life sentence with a thirty-year parole bar on the murder conviction. Roland Bartlett, at a separate trial, was convicted and sentenced to a life term with a thirty-year parole bar for arranging the killing.

At Clausell's penalty trial, his mother testified that his father had left her and six children when Clausell was approximately six years old. Clausell began working at the age of seven to help support the family. He dropped out of high school after completing the tenth grade and later enrolled in vocational school. His mother stated that Clausell was the "man of the house," and that he advised his siblings. Clausell's brothers and sisters testified that he was like a father to them. Clausell was the father of one child. The jury found aggravating factors c(4)(b), grave risk to another and c(4)(d) pecuniary motive, and mitigating factors c(4)(c), age; c(5)(f), no significant criminal history; and c(5)(h), the catchall mitigating factor. The jury found that each aggravating factor outweighed all of the mitigating factors and sentenced Clausell to death. On direct appeal his death sentence was reversed because the trial court had failed to instruct the jury that Clausell must have knowingly or purposefully intended to kill the victim to be guilty of capital murder. *State v. Clausell,* 121 *N.J.* 298, 313–16, 580 *A.*2d 221 (1990). On remand, Clausell was convicted of noncapital murder.

### C) *Anthony DiFrisco 1A and 1B*

Anthony DiFrisco met Anthony Franciotti in 1984 when both were imprisoned together. After they were released, Franciotti asked DiFrisco to kill Edward Potcher. Franciotti believed that Potcher, a pizzeria owner, intended to inform the police about Franciotti's drug-dealing enterprise.

DiFrisco agreed to commit the murder in exchange for $2500 cash and the cancellation of a $500 drug debt. In early August 1986, Franciotti made a $700 down payment. On August 12, 1986, Franciotti picked up DiFrisco and the two men drank alcohol and

smoked marijuana. DiFrisco also purportedly used heroin. Franciotti then drove DiFrisco to the pizzeria where DiFrisco chatted with Potcher. When a delivery boy entered the establishment, DiFrisco ordered a pizza and soda to occupy his time until he could be alone with his victim. After the delivery boy left, DiFrisco asked Potcher for another soda. When Potcher reached for the soda, DiFrisco shot him four times in the head and once in the arm. DiFrisco returned to Franciotti's car and Franciotti drove him home. The following day, Franciotti paid the balance of the fee.

The murder remained unsolved until the following spring when DiFrisco confessed after he was arrested in New York City for several routine street crimes, including car theft and reckless endangerment. Because DiFrisco was on probation, he knew that a conviction would mean certain jail time. He asked the arresting officer if there was something he could do to avoid going to prison. The officer told DiFrisco that he could improve his situation by informing the police about any major crimes, such as robberies or homicides. DiFrisco then confessed to killing Potcher, implicated Franciotti, and agreed to cooperate with the prosecution of Franciotti. Later, however, DiFrisco refused to assist prosecutors in their efforts to tape-record Franciotti.

DiFrisco was addicted to heroin and cocaine and had served jail time for two prior adult burglary and criminal trespass convictions. He also had a troubled childhood and grew up without self-esteem. He lacked love, recognition and attention from his father, his mother failed to give him discipline and guidance, and his brothers were drug addicts.

DiFrisco was charged with capital murder and weapons offenses. He pled guilty to knowing-and-purposeful murder, and waived a penalty-phase jury. The court found aggravating factors c(4)(d), pecuniary motive; and c(4)(f), murdering to escape detection, and the c(5)(g) mitigating factor, substantial assistance to the State. The court sentenced him to death. On direct appeal,

DiFrisco's sentence was reversed because there was no extrinsic corroboration of his confession indicating that Franciotti had hired DiFrisco to kill Potcher. *State v. DiFrisco,* 118 *N.J.* 253, 571 *A.*2d 914 (1990) (*DiFrisco I* ).

On remand, a penalty trial was held before a jury. The jury found the existence of the c(4)(d), pecuniary motive, aggravating factor and the c(5)(g) mitigating factor, substantial assistance to the State, as well as eight separate instances of the c(5)(h) catchall mitigating factor. After unanimously concluding that the aggravating factors outweighed the mitigating factors, the jury sentenced DiFrisco to death. The sentence was affirmed on direct appeal, *State v. DiFrisco,* 137 *N.J.* 434, 645 *A.*2d 734 (1994) (*DiFrisco II* ), and found not disproportionate in *DiFrisco III, supra.*

### D) *Danny Harris*

On November 23, 1991, the police received a report of a shooting. Upon their arrival at the scene, the officers were directed to a third-floor apartment, where they noticed that the door frame had been damaged. They entered and found Georgia Wooten standing in the kitchen. Wooten led the officers to a front bedroom where they found Rondell Germany lying face down on the floor. Wooten identified the victim as the father of her sister's children. The unconscious victim was transported to the hospital where he died later that day. The autopsy revealed that Germany died as a result of a gunshot wound to the chest causing injuries to his lungs and heart.

The police interviewed Wooten, who told them that Germany had stopped by and asked if he could come upstairs and speak with her sister. Because Germany had assaulted her sister a few days earlier, Wooten refused to let him speak with her. According to Wooten, Germany became angry and said, "I'm not going to kill her, I'm going to bust her shit up." He and Wooten argued for approximately forty minutes.

Eventually, another resident left the building and allowed Germany to enter. Wooten met Germany on the second floor landing, and the two spoke for about fifteen minutes. According to Wooten, she then noticed a man with a handgun standing on the second floor landing. Wooten yelled, "Don't shoot me," and fled. Before she entered her apartment, however, Wooten heard a gunshot. Moments later, Germany yelled to her to let him into her apartment. He forced his way in and collapsed on the front bedroom floor.

The police also spoke to a witness who said he could identify the killer. The witness told police that he went downstairs after he had heard the doorbell ring. When he opened the door, a man wearing a gray-hooded sweatshirt asked for Germany. The witness told the man that Germany was upstairs. As the man went upstairs, the witness called out to Germany and told him that the man in the sweatshirt was looking for him. Germany looked down and then returned to his conversation with Wooten. The male pulled out a long-barreled handgun and pointed it at Germany. Germany said, "What's up?" The male then shot Germany and fled.

During the ensuing investigation, the police obtained a tape recording of a male and a female talking about Germany's murder and the money that would be supplied to the shooter to get him out of town. Wooten's sister identified the female voice as that of Wooten and the male voice as that of Wooten's nephew, Walter Wilson. The police read Wooten her rights, and she implicated Wilson.

On November 25, 1991, another witness reported that on the day of the incident he had spoken to Danny Harris, who also went by the name of Tarique. Harris told the witness that he was being paid to shoot someone that day. Later that same day, the witness learned that Germany had been shot and killed, and that Harris was the shooter. The witness identified a photo of Harris,

and a bench warrant was issued for Harris's arrest. Harris was apprehended on December 27, 1991.

Harris was charged with conspiracy to commit murder, capital murder, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose. On October 28, 1993, the jury convicted Harris of all charges. At the penalty phase, the jury found aggravating factor c(4)(d), pecuniary murder, and mitigating factors c(5)(d), mental disease, defect or intoxication; and c(5)(h), the catchall factor. Under the c(5)(h) mitigating factor, the jury found thirteen separate factors including that Harris suffered from organic brain damage, learning disabilities, a history of alcohol and drug abuse, and a troubled childhood and upbringing. The jury found that the aggravating factor did not outweigh the mitigating factors beyond a reasonable doubt. The trial court sentenced Harris to thirty years without parole, with a concurrent four-year term for unlawful possession of a weapon. The other convictions were merged for sentencing purposes.

At the time of the offense, Harris was thirty-one years old and lived with his mother. He was divorced and had fathered four children by three different women. Harris dropped out of high school after completing tenth grade. He was self-employed as a home repairman and had also worked as a welder. Harris took medication daily for headaches resulting from a 1981 motorcycle accident. He admitted abusing alcohol in the past and claimed that he was intoxicated at the time of the offense. Harris denied the use of narcotics but had a prior conviction for possession of controlled dangerous substances.

### E) *Richard Irizarry*

Irizarry was charged with capital murder and other lesser offenses for his part in the February 7, 1990, killing of Angel Laboy. On March 2, 1990, Irizarry provided a statement to the police. Irizarry asserted that on February 7, 1990, he was approached by Julius Boeglin. Boeglin asked Irizarry to kill Laboy because he was talking too much about Boeglin's drug business

and owed Boeglin $1800. Boeglin offered Irizarry $1000 to perform the killing.

Boeglin, his girlfriend, and Irizarry drove to a pizzeria where, as they sat in the car, Boeglin identified Laboy. Boeglin gave Irizarry a gun and told him to "get him now." Irizarry stated that when he hesitated on getting out of the car Boeglin, with another gun in his hand, told Irizarry that he would be watching him. Irizarry said, "The way [Boeglin] told me, he made me feel like he was gonna shoot me." Irizarry got out of the car and called out Laboy's name. Laboy turned, and on realizing what Irizarry was about to do, told Irizarry that Boeglin would kill him too. Irizarry stated that he then shot Laboy five or six times. Shortly thereafter, the police received a call about a homicide. At the scene, the police found Laboy, a twenty-eight year old male, lying on the sidewalk covered with blood. Laboy later died from massive internal bleeding caused by four gunshot wounds to the chest.

During their investigation the police learned that Laboy had been dealing drugs for Boeglin and owed Boeglin approximately $1800. The police also learned that on January 12, 1990, Boeglin had been arrested at his place of business for possession of a controlled dangerous substance. Boeglin suspected that Laboy had set him up and had threatened to kill Laboy. Additionally, two weeks prior to his death, Laboy had been attacked by three men and was cut on his throat.

On February 27, 1990, a witness contacted the police stating that he had information about Laboy's murder and that his life was in danger. The witness became an informant and, on March 1 and 2, 1990, secretly recorded his conversations with Irizarry, Boeglin and another witness. Although the tapes of those conversations were later ruled inadmissible, on March 2, 1990, the police obtained arrest warrants for Irizarry and Boeglin. Officers arrested Irizarry and picked up a second witness who admitted to "getting rid of a gun" for Irizarry by throwing it in a river. The second witness also told the police where they could find Boeglin.

As a result, Boeglin and his girlfriend were later arrested at Boeglin's apartment. The police towed the girlfriend's car because it matched the description of the car used in Laboy's murder.

Irizarry was charged with conspiracy to commit murder, capital murder, retaliation against a witness, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose. When he volunteered to testify against Boeglin, the State reconfirmed its intention to prosecute Irizarry capitally, but agreed that his testifying against Boeglin could be used to establish mitigating factor c(5)(g), assistance to the State, should Irizarry be convicted of capital murder. Boeglin was convicted of noncapital murder.

After Boeglin's trial, Irizarry's counsel sought to negotiate a plea on Irizarry's behalf based upon his cooperation with the State. The negotiations were unsuccessful, and a dispute arose over whether the prosecutor's office had improperly used Irizarry's immunized testimony against Boeglin in preparing for Irizarry's trial. The Appellate Division determined that the entire prosecutor's office would not be disqualified even though some of its members were familiar with the Boeglin trial and were potential defense witnesses in a penalty-phase hearing. Twenty-two days later, on March 22, 1994, Irizarry pled guilty to aggravated manslaughter, and was sentenced to a forty-year term with a twenty-year parole bar. *State v. Irizarry,* 271 *N.J.Super.* 577, 639 *A.*2d 305 (App.Div.1994).

At the time of the offense, Irizarry was twenty-six years old and lived with his mother. He was divorced and the father of two children. Irizarry dropped out of school in the tenth grade and was employed as a cabinet maker. He apparently had attended Alcoholics and Narcotics Anonymous meetings when incarcerated in the past and claimed to have been addicted to "hits" since the age of twelve. His prior convictions included robbery, burglary, resisting arrest, possession of stolen property, criminal trespass,

and unlawful use of a vehicle. He was on parole at the time of the murder.

The AOC coded as present aggravating factor c(4)(d), pecuniary motive, and mitigating factors c(5)(d), diminished capacity; c(5)(g), substantial assistance to the State; and the c(5)(h) catchall mitigating factor.

### F) *Miguel Melendez*

Melendez, allegedly fleeing military service and criminal convictions, came to the United States from Cuba in 1980. He lived for a time with Lazaro Trimino. Pedro Gerome offered Trimino $5000 and a Miami vacation if Trimino would kill or hire someone to kill a certain person in Jersey City. Trimino hired someone, and Gerome gave that person a gun. However, the person was arrested for possessing the gun before the plan could be carried out. Trimino then asked Melendez, who agreed to perform the killing for $5000 and to prove his friendship to Trimino. Trimino instructed Melendez to wait in the victim's apartment building and confirm the victim's identity by inquiring about a car that the victim was selling.

As the victim returned from shopping with his ten-year-old daughter, Melendez approached him and asked in Spanish about the car. The victim replied that he had already sold the car. Melendez then asked the victim for money. Replying that he had none, the victim walked away. The daughter, who was walking ahead of her father, heard two shots and turned to see her father fall to the ground. He was taken to a hospital where he died. When police officers arrived at the scene, the daughter gave them a description of Melendez. The victim was a former political prisoner in Cuba and the head of a club of former prisoners. He was survived by his wife and two daughters.

Through information provided by an informant, the police were able to tape a telephone conversation in which Melendez admitted receiving money for killing someone in Jersey City. When arrest-

ed, Melendez waived his rights and gave a statement. He acknowledged that he had committed the murder and had fled to Puerto Rico. Melendez also stated that Trimino had hired and paid him to kill the victim. Melendez told the police that he killed to prove his friendship to Trimino: "My friend Trimino had a problem with [the victim]. In Cuba you show your friendship by doing deeds without asking questions. I agreed to kill him.... I shot him in cold blood."

Melendez and Trimino were charged with conspiracy to commit murder, purposeful and unlawful murder, possession of a handgun for unlawful purposes, and unlawful possession of a handgun. Melendez was convicted on all counts. At the penalty trial, a psychiatrist and a psychologist testified that Melendez was borderline mentally retarded and that he had an IQ of 70. There was also testimony that Melendez had given a statement to the police which resulted in the arrest of Trimino. The jury heard that Melendez was strongly influenced by Trimino, and that Trimino gave Melendez alcohol and pills on the day of the killing. Melendez expressed remorse for the killing.

The jury found aggravating factor c(4)(d), murder for pecuniary gain. Melendez had asserted mitigating factors c(5)(a), extreme mental or emotional disturbance; c(5)(d), mental disease, defect or intoxication; c(5)(g), assistance to the State; and c(5)(h), the catchall factor, but the jury found only mitigating factors c(5)(g) and c(5)(h) and was unable to agree on the weighing of the aggravating and mitigating factors. Consequently, the trial court sentenced Melendez to life imprisonment with a thirty-year parole bar. The court merged the conspiracy conviction into the murder conviction, gave Melendez a consecutive ten-year sentence with a three-and-one-half-year disqualifier for possession of a weapon for an unlawful purpose, and merged the unlawful-possession conviction into the possession-for-an-unlawful-purpose conviction.

Trimino pled guilty to conspiracy to commit murder and received a sentence of ten years with no parole ineligibility. As part

of his plea agreement, Trimino agreed to aid the State in the prosecution of Melendez. Gerome has apparently fled the country and has not been prosecuted.

### G) *Charles Pinchom*

Codefendant Celestine Payne, *see infra* at 248–49, 731 A.2d at 1105, took out a $25,000 life insurance policy on an eighteen-year-old woman who lived with her. Then, in December 1994, Payne asked Charles Pinchom to kill the woman. Pinchom maintained that he initially refused Payne's request. However, Payne's daughter Wendy said that she was aware in January 1995 of Pinchom's plan to kill the victim. Also, on September 13, 1994, Pinchom had stabbed another victim for whom Payne had bought a life insurance policy that named her as the beneficiary. Like the young woman, this other victim lived in Payne's home; unlike the young woman, the other victim survived the stabbing.

At Payne's request, on March 3, 1995, Pinchom came to her home. When he arrived, Payne gave him a crowbar. As the victim was curling her hair, Pinchom lethally bludgeoned her on the head four or five times. Pinchom and Payne then tried to hide the murder. They cleaned up the victim's blood, dressed her, placed her in a sleeping bag, and dropped her body at a park where two joggers subsequently found her. Pinchom also planned to blow up Payne's home that very day so that Payne could collect on a $538,000 insurance policy, but this scheme was never carried out.

Pinchom confessed to committing these crimes. At the time of the murder, he was twenty-two years old and lived with his parents. He had dropped out of high school while in eleventh grade, was single, and had fathered two children. He was dealing drugs, although he had previously worked as a stock boy, dishwasher, and cook. He had also smoked marijuana daily since he was sixteen years old and had prior convictions for sexual assault

and possession of cocaine with intent to distribute. He was on parole when he murdered the victim.

A grand jury indicted Pinchom for conspiracy to murder, attempted murder, capital murder, two counts of hindering apprehension, and weapons offenses. He pled guilty to two counts of conspiracy and one count of attempted murder, noncapital murder, and possession of a weapon for an unlawful purpose. As part of the plea agreement, he agreed to cooperate with the State in connection with the prosecutions of Celestine, Wendy, or Wendy's brother.

Pinchom was sentenced to twenty years imprisonment for attempted murder and to a consecutive term of life with thirty years of parole ineligibility for noncapital murder. His remaining convictions merged for sentencing purposes.

The AOC coded as present aggravating factor c(4)(d), pecuniary motive, and the c(5)(h) catchall mitigating factor.

### III. *Pecuniary–Motive Principal Killers: I–2*

#### A) *Francis Brand*

Francis Brand hired Randy Burroughs to kill Brand's abusive, drug dealer brother for $2000. *See supra* at 228–29, 731 *A.2d* at 1094–95, for a more detailed description of the crime. Brand denied any involvement in the killing, but expressed remorse at his brother's death. He claimed that Burroughs had acted solely out of anger over an altercation with the victim. A jury convicted Brand of murder and conspiracy to commit murder. The case was not prosecuted as a capital case even though the State could have asserted aggravating factor c(4)(e), procuring murder for payment, and Francis could have presented mitigating factors c(5)(a), extreme mental or emotional disturbance; c(5)(f), no prior record; and c(5)(h), the catchall factor.

Brand did not have a criminal record. He dropped out of high school in the twelfth grade, but later received his diploma. Unem-

ployed at the time of his arrest, he had earlier worked sporadically as a janitor. He was single, had no history of drug abuse, and denied any mental illness.

### B) *Herbert and William Engel*

The State tried Herbert and William Engel together, and sought the death penalty. William, married to the victim, Xiomara Engel, suspected his wife of infidelity. Although a private investigator hired by William found no evidence that his wife was unfaithful, William remained suspicious and jealous. He often confronted his wife with his suspicions, abusing her both verbally and physically.

Xiomara's aunt and mother witnessed two beatings, during which William claimed that Xiomara deserved to be killed. The marriage ended in an annulment, but William continued to harass Xiomara and sought to prevent her from obtaining employment to ensure that she would not meet other men. He also began making harassing phone calls to Andres Diaz, for whom Xiomara had worked as a secretary and with whom Xiomara had developed a relationship.

On December 13, 1984, Xiomara agreed to meet William at his office in order to go on a joint shopping trip for their daughter's Christmas presents. Xiomara dropped off her children and her grandfather at her apartment, explaining that she was on her way to meet William. That evening, William called twice to tell the grandfather that Xiomara had failed to keep the appointment.

At 8:00 p.m. police responded to a burglar alarm at William's place of business. They saw a car belonging to Herbert Engel, William's brother, in the parking lot. William responded to the officers' knocks, assured them that everything was in order, and quickly closed the door. Suspicious, the officers remained at the scene. When William came back, the officers ordered him to open the door, but William, appearing nervous, came outside and shut the door. He answered the officers' questions in an evasive

manner, but because the policemen recognized William as the owner of the building, they did not detain him or otherwise pursue the matter.

The next day, Xiomara's oldest daughter told Xiomara's mother that Xiomara had never returned, and later that morning William called to say that Xiomara had failed to appear for their shopping trip. When the mother said that she was going to call the police, William suggested that she wait until he could go with her to the police station that afternoon. When William failed to arrive by 11:00 p.m., Xiomara's mother, accompanied by Diaz, went to the police without William. Subsequently, as part of their search for Xiomara, the police interviewed William at his home, during which he chain-smoked and again appeared nervous. He repeated his claim that he had not seen the victim on the night of December 13.

On December 14, the South Carolina police discovered a body in a burned station wagon. The license plates had been removed, but the police were able to trace the car's ownership to Xiomara and to identify her body through her dental records. For reasons not stated in the record, the police arrested James McFadden. In return for the State's promise to waive capital prosecution and to recommend that any sentences run concurrently, McFadden revealed that Xiomara had been murdered, explained his role in the killing, and implicated both William and Herbert.

In early December 1984, McFadden had been hired by Herbert as a salesman, although they had never agreed on a salary. Shortly after he was hired, McFadden was invited by Herbert to meet him at a restaurant. There, Herbert introduced his "cousin" William to McFadden and told McFadden that William had a girlfriend who was harassing him. When Herbert said that William would pay $25,000 to have the girlfriend killed, McFadden did not respond. At Herbert's request, they met again several days later. Herbert repeated the offer, and McFadden agreed to commit the murder. They were to meet at William's warehouse the following Thursday. McFadden arrived, carrying a briefcase

that held a wire cord that he had removed from the back of a refrigerator. When Herbert learned that McFadden was not carrying a gun, he opened his own briefcase in which he had a revolver.

Herbert directed McFadden to strangle the victim when she arrived with William who would pretend to turn on the light. After the killing, McFadden was to transport the body to the Engels' grandparents' home in South Carolina. McFadden was told to place the body in a hole and cover it with acid, and to have the car crushed. Herbert gave McFadden a pair of elbow-length, thick rubber gloves to use in disposing of the body. He then gave McFadden $1300 in cash and told him to hide in the bathroom.

William entered the office with Xiomara as planned. He fumbled with the light switch, claimed that it did not work, and walked past the bathroom to get a flashlight. As Xiomara followed, McFadden jumped out and pulled the cord around her neck. When she fell to the floor, McFadden strangled her. During the four-minute ordeal, William watched, smoked a cigarette, and called his former wife a "bitch."

After Xiomara died, McFadden backed her station wagon into the garage and, with William's help, threw the body into the car. William went outside while McFadden covered the body. When William returned to the garage, he was nervous and said that the police were outside. After William dealt with the police, McFadden left, driving Xiomara's station wagon. McFadden picked up Lewis "Pee Wee" Wright, an employee of Engel's who had agreed to accompany McFadden on the ride, and drove to South Carolina. Wright, uninformed of the drive's purpose, discovered the body during the trip. On their arrival in South Carolina, Wright burned the car, after which the two men celebrated the occasion at a bar.

When they returned to New Jersey, Herbert gave McFadden $5000. Later, Herbert discovered that Wright had accompanied McFadden on the trip. Herbert instructed McFadden to kill

Wright and paid McFadden another $1000. McFadden did not agree to this second murder, but he assured Herbert that he would "take . . . care of things."

At trial, McFadden testified against William and Herbert. Pursuant to his agreement with the prosecutor, McFadden's testimony was given in exchange for the State's promise not to seek the death penalty against him and to recommend that any sentences imposed run concurrently. McFadden was found guilty of murder and sentenced to life imprisonment with a minimum parole ineligibility of thirty years.

At the time of the murder, Herbert Engel was the father of two sons and a daughter. He had no prior criminal record and attended church regularly. At the time of the penalty trial, Herbert was thirty-eight years old and William was forty years old. William had two sons from his first marriage and a daughter from his marriage to the victim. He had graduated from high school and attended two years of college. He was a successful businessman who owned two large homes and was involved in many charitable organizations, attended church regularly, and had no prior record.

William and Herbert were convicted of murder and conspiracy to commit murder. The jury found that they had paid to have the murder committed. At the penalty phase, the Engels' father recalled the day his own father was killed in a Nazi concentration camp and noted that "this day may be rougher than that one." The father and his brother testified that both William and Herbert had three children who needed the guidance of their fathers. The sons wrote: "Please don't kill them, please let them live."

The jury found the aggravating factor c(4)(e), hiring a killer, and mitigating factors c(5)(a), extreme mental or emotional distress; c(5)(e), duress; c(5)(f); no prior criminal record; and c(5)(h), the catchall factor. The jury further found the aggravating factor did not outweigh the mitigating factors, and the court sentenced William and Herbert each to a life term with a thirty-

year period of parole ineligibility. The Appellate Division affirmed the convictions and sentences. *State v. Engel,* 249 *N.J.Super.* 336, 592 *A.*2d 572 (App.Div.1991), *certif. denied,* 130 *N.J.* 393, 614 *A.*2d 616 (1991).

After the Engels' sentencing, McFadden recanted his testimony that Herbert and William had conspired with him to kill the victim and that they had paid him to do the killing. He sought a vacatur of his guilty plea on the grounds that it was not entered voluntarily. McFadden claimed he accidentally killed Xiomara by hitting her in the head with a rock during a burglary attempt at the warehouse. Herbert and William moved for a new trial, but McFadden later repudiated his recantation. The brothers' motion for a new trial was denied, and on remand McFadden was resentenced to life imprisonment with a thirty-year period of parole ineligibility.

### C) *Robert Marshall*

Robert Marshall, a fifty-four-year-old insurance agent, began having an extramarital affair with Sarann Kraushaar in June 1983. Although Marshall had substantial financial resources, he lived beyond his means and accumulated debts in excess of $168,000. At the time of Maria Marshall's death, her husband maintained insurance policies on her life totaling over one million dollars. Several of those policies were acquired just months before the homicide, and Marshall and the decedent were examined for an additional policy on the morning preceding her death. As early as December 1983 Marshall mentioned to Kraushaar the idea of killing his wife.

In May 1984, Marshall met codefendant Robert Cumber at a party. Cumber introduced him to codefendant Billy Wayne McKinnon, a former sheriff's officer from Louisiana. Marshall arranged to meet with McKinnon on June 18, 1994, at which time Marshall told McKinnon that he wanted Maria killed, and that he wanted the murder to take place that night. McKinnon asked for $100,000, but accepted Marshall's offer of $65,000. Marshall had

already paid McKinnon $5,000 to "investigate" his wife and planned to advance an additional $10,000. The remaining $50,000 would come from anticipated insurance proceeds.

McKinnon did not kill Maria that night. Marshall called him the following morning to inquire why the murder did not take place and McKinnon said he needed to return to Shreveport, Louisiana, to obtain the appropriate weapon. After McKinnon's trip to Louisiana, Marshall and McKinnon met on July 19, 1984. Marshall had devised a plan whereby he would stop at an all-night restaurant with his wife. When he left the car to use the bathroom, McKinnon was to kill Maria. Again McKinnon did not kill Maria, this time because police officers were parked at the restaurant and Marshall failed to arrive at the appointed hour. Subsequently, Marshall placed many calls to McKinnon complaining that he had not carried out the plan. Using Cumber as an intermediary, he offered McKinnon an additional $15,000 to murder Maria before Labor Day.

Marshall and McKinnon met once more on September 6, 1984. They drove southbound on the Garden State Parkway to select a site for the homicide. After rejecting two locations, McKinnon agreed to use the Oyster Creek Picnic Area. The men formulated a scheme designed to look like a robbery gone awry. They agreed that on his way back from Atlantic City, Marshall would park in the picnic area claiming car trouble. Then, the perpetrator, alleged by McKinnon to be codefendant Larry Thompson, would hit Marshall over the head and fatally shoot Maria.

Maria was murdered that evening according to plan. She had been shot twice in the back from close range. Marshall's wallet was found on the ground by the car which had a slashed tire. Marshall, Cumber, McKinnon and Thompson were all charged with conspiracy and murder. Marshall was charged with procuring the murder-for-hire, Cumber and McKinnon were charged as accomplices, and Thompson was charged with own-conduct purposeful-or-knowing murder.

McKinnon confessed. He testified for the prosecution at Marshall's trial and pled guilty to conspiracy. He received only a five-year prison sentence. Cumber was found guilty on all counts and sentenced to thirty years imprisonment without parole. Thompson, who was tried with Marshall, was acquitted of all charges.

At the time of the murder, Marshall was the father of three sons. He and Maria had been together since college. Marshall was an insurance broker, had a good reputation in the community, and was involved in many charitable organizations.

The guilt phase jury convicted Marshall of conspiracy and capital murder. At the penalty phase, the jury found aggravating factor c(4)(e), murder procured by payment, and mitigating factor c(5)(f), no significant criminal history; and c(5)(h), the catchall mitigating factor. Finding that the aggravating factor outweighed the mitigating factors, the jury sentenced Marshall to death.

This Court affirmed the conviction and sentence on direct appeal, *State v. Marshall*, 123 *N.J.* 1, 586 *A.*2d 85 (1991) (*Marshall I* ), and proportionality review, *Marshall II, supra*.

### D) *Celestine Payne 2*

At the urging of Celestine Payne, who was the beneficiary of a $25,000 insurance policy on the life of the victim, Charles Pinchom killed the victim. The details of the murder are described *supra* at 240–41, 731 *A.*2d at 1101. The investigation of this crime led to the discovery of evidence implicating Payne in the murder of her husband, *see supra* at 226–28, 731 *A.*2d at 1094, and in the attempted murder of still another victim, *see supra* at 227, 731 *A.*2d at 1094. At the time of the murder, Payne was forty-four years old. She lived with two of her four children and supported herself on the life insurance money she collected after she killed her husband.

For her crimes, a grand jury charged her with two counts of murder and conspiracy to commit murder, one count of attempted

murder, three counts of hindering apprehension, two counts of forgery, and two counts of possession of a weapon for an unlawful purpose. She pled guilty to all charges on May 28, 1997. On each murder conviction, the court sentenced Payne to concurrent terms of life imprisonment with a thirty-year period of parole ineligibility.

The AOC coded as present aggravating factor c(4)(e), procured by payment, and mitigating factors c(5)(d), diminished capacity; c(5)(f), no significant criminal history; and the c(5)(h) catch-all factor.

HANDLER, J., dissenting.

Proportionality review of death sentences in New Jersey has become crude and imprecise. It allows for the possibility that the Court may find a sentence proportionate based upon comparison to the sentences of a designated group of defendants; yet that review may have overlooked comparison to a number of individuals most like defendant, perhaps even more culpable. We consciously accept that risk, as we accept that we may sacrifice a perfectly individualistic assessment of a defendant's death sentence in the interest of uniformity. *See State v. Ramseur*, 106 *N.J.* 123, 330, 524 *A.*2d 188 (1987) (noting that dual aims of uniformity and individualization create an "inherent paradox in the process"); *see also id.* at 347, 351, 524 *A.*2d 188 (Handler, J., dissenting) (noting that premises of uniformity and individuality underlying proportionality review are fundamentally inconsistent and irreconcilable).

The present case demonstrates how the risks of classification that we generally accept as necessary elements of the review may be exploited. The procedural framework designed to protect the rights of capital defendants has been manipulated to defendant's disfavor. John Chew was classified as death-eligible solely on the ground that he murdered for insurance proceeds; a classification which, I maintain, was contrary to the intent of *N.J.S.A.* 2C:11–3c. Having sentenced Chew as a member of a group of pecuniary gain

killers from which he should have been set apart, the Court presently fails to compare Chew to the death-eligible defendants with whom he has the most in common—those who murdered loved ones, relatives, or friends for insurance proceeds or inheritance. Comparison with these defendants, none of whom were death-sentenced, shows that Chew's sentence is arbitrary.

For this reason, and because I maintain that evidence of the risk of race discrimination in the imposition of this State's death penalty mandates that we discontinue capital punishment, *see State v. Loftin*, 157 *N.J.* 253, 373–412, 724 *A.*2d 129 (1999) (Handler, J., dissenting) (*Loftin II* ); *see also State v. Harvey*, 159 *N.J.* .277, 361–74, 731 *A.*2d 1121 (1999) (Handler, J., dissenting) (*Harvey III* ); *accord State v. Cooper*, 159 *N.J.* 55, 163–64, 731 *A.*2d 1000 (1999) (Handler, J., dissenting) (*Cooper II* ), defendant's death sentence must be vacated.

Therefore, I dissent.

I

On January 12, 1995, John Chew slashed the throat of his girlfriend, Theresa Bowman, as she sat in the driver's seat of his Corvette. *State v. Chew,* 150 *N.J.* 30, 42, 695 *A.*2d 1301 (1997). The police learned that Bowman was having an affair, *id.* at 44, 695 *A.*2d 1301, and that she and Chew had agreed to separate on the day she was murdered. *Id.* at 48, 695 *A.*2d 1301. The police also discovered that Chew was the beneficiary of a $250,000 life insurance policy on Bowman, and that his plans to kill his girlfriend for the benefit were longstanding. *Id.* at 43–44, 695 *A.*2d 1301.

A jury convicted Chew of purposeful or knowing murder by his own conduct, contrary to *N.J.S.A.* 2C:11–3a(1) or (2), as well as possession of a weapon for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–4d. *Id.* at 49, 695 *A.*2d 1301. The jury's finding that Chew "committed the murder as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value,"

*N.J.S.A.* 2C:11–3c(4)(d), triggered a penalty trial. *Id.* at 50, 695 A.2d 1301. The jury found no other aggravating factors.

At the penalty trial, defendant presented extensive mitigating evidence, most of which the jury found to support *N.J.S.A.* 2C:11–3c(5)(h), the catch-all mitigating factor. *See ibid.* The jury unanimously found that Chew was emotionally and culturally deprived by his parents, who failed to provide him with basic guidance, structure and stability. His delinquent behavior was ignored or even condoned: he was not encouraged academically; excessive absences were tolerated, culminating in his leaving school in the seventh grade; and he and his brothers engaged in thievery and other delinquent acts, much of which was done with their parents' knowledge and approval. Further, both parents were involved in numerous extramarital affairs; his mother often brought her lovers home with the children present.

Eleven jurors also found that defendant was raised in a violent home, where he witnessed serious acts of violence by both parents against each other. His mother, the jury appreciated, was immature, resentful and ill-equipped to care for her children and meet their basic physical and emotional needs; whereas his father was financially irresponsible, emotionally absent, and sexually promiscuous.

Nine jurors found that defendant had suffered from serious mental and emotional disturbance as a youth, reflected in numerous juvenile institutionalizations. They recognized that at multiple times in his life Chew was effectively abandoned by his parents. Chew's parents were frequently separated from each other and while the parents alternated custody arrangements the non-custodial parent failed to maintain contact with their children.

Seven jurors found that the Chew family moved so frequently that not only were long lasting friendships non-existent, but any intervention to address the family's multitude of problems by school or mental health officials was almost impossible. Defendant's education difficulties were evident as early as the second grade, but little, if any, effort was made to correct or compensate

for these deficiencies. As a result, Chew developed a fear of school which contributed to poor self esteem and loss of self worth.

Six jurors appreciated defendant's relationship with his eleven-year old daughter Valerie, whom he loved and who loved him in return. Although Chew's relationship with his daughter was limited by Chew's incarceration, these jurors recognized that Chew continued to be an important and necessary part of Valerie's life and would continue to play a significant role in her upbringing. *See ibid.*

Five jurors found that defendant's parents raised him to believe he was worthless—his mother told him she hated him and wished he was dead and his father often denied paternity. Three jurors found that defendant's parents failed to protect him from harm, ignoring signs of sexual abuse by his maternal aunt and witnessing physical abuse by his maternal grandmother. Ten jurors found an additional, unspecified catch-all mitigating factor.

Despite Chew's anguished confessions, the penalty jury concluded that the sole aggravating factor—that Chew killed for pecuniary gain—outweighed the mitigating evidence and sentenced Chew to death. *Ibid.*

## II

A sentencing jury must unanimously find at least one statutory aggravating circumstance in order for a defendant convicted of first degree murder to be eligible for a death sentence. *See* N.J.S.A. 2C:11–3. "In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by legislative guidelines." *Gregg v. Georgia,* 428 *U.S.* 153, 206, 96 *S.Ct.* 2909, 2940, 49 *L.Ed.*2d 859, 893 (1976). Chew's jury found only one aggravating factor—that defendant "committed the murder as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value." *N.J.S.A.* 2C:11–3c(4)(d). *N.J.S.A.* 2C:11–3c(4)(d), however, was not intended to and should not encompass killings for insurance proceeds. *See Chew, supra,* 150 *N.J.* at 88–

101, 695 *A*.2d 1301 (Handler, J., dissenting). The c(4)(d) aggravating factor should not have been before the jury as a matter of law. *See ibid.* Defendant's eligibility for death was thus entirely dependent upon the jury's mistaken belief that Chew, if he murdered for insurance proceeds, killed for "pecuniary value" as contemplated by *N.J.S.A.* 2C:11–3c(4)(d).

The language and construction of the statutory provision—"as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value"—demonstrate that the c(4)(d) aggravating factor was intended to apply solely to contract killers, those who accept payment in return for committing a homicide. "Consideration" imports a mutual understanding between two parties, a meeting of the minds. *See id.* at 90, 695 *A*.2d 1301 (Handler, J., dissenting). The clause "expectation of the receipt of anything of pecuniary value" merely extends the requisite consideration to a future payment, as opposed to one past or present. *See id.* at 91, 695 *A*.2d 1301 (Handler, J., dissenting); *accord State v. Clausell,* 121 *N.J.* 298, 344, 580 *A*.2d 221 (1990) (holding instruction on c(4)(d) factor requires "telling jury that it must specifically find that defendant either received payment, or expected to receive payment, for having killed [victim]"). As such, statutory aggravating factors c(4)(d) and *N.J.S.A.* 2C:11–3c(4)(e), which applies to a defendant who "procured the commission of the offense by payment or promise of payment of anything of pecuniary value," are symmetrical complements. Both involve consideration and apply to contract murderers: the former applies to the hired gun, the latter to the hirer. *See Chew, supra,* 150 *N.J.* at 93, 695 *A*.2d 1301 (Handler, J., dissenting).

This interpretation of the c(4)(d) aggravating factor is consistent with the Court's reasoning in *State v. DiFrisco,* 142 *N.J.* 148, 662 *A*.2d 442 (1995) (*DiFrisco III* ). DiFrisco was convicted of murder-for-hire, for which the sentencing jury found that the c(4)(d) aggravating factor applied. *See State v. DiFrisco,* 137 *N.J.* 434, 450, 645 *A*.2d 734 (1994) (*DiFrisco II* ). For purposes of proportionality review, the Administrative Office of the Courts (AOC)

classified DiFrisco in category I, which includes defendants who committed a "murder involving a pecuniary motive other than robbery or burglary," excluding those whose crimes involved sexual assault, arson, kidnapping, multiple victims, or a victim who is a public servant. *See DiFrisco Report*, tbl. 7 (Nov. 7, 1994); *accord Chew/Cooper/Harvey Report*, tbl. 7 (Dec. 3, 1997) (*CCH Report*). Category I is comprised of four subcategories: contract killers, subcategory I–1; contract principals, subcategory I–2; other pecuniary gain murderers, subcategory I–3; and contract killers who were hired by the victim, subcategory I–4. *See id.*, tbl. 6. DiFrisco, a hired killer, was classified in subcategory I–1. For proportionality comparison, the Court used a composite of the subcategories, comparing DiFrisco to all defendants in category I.

An unmodified comparison of DiFrisco's sentence to the composite I category would have included cases AOC-designated as I–3 for "other pecuniary gain" murders, such as murders motivated by the receipt of inheritance or life insurance benefits. The Court, however, declined to compare DiFrisco to defendants who killed for insurance proceeds. Specifically, the Court removed defendant Walter Williams, classified as I–3, on the ground that "the jury rejected the pecuniary-motive aggravating factor at his penalty trial." *DiFrisco III, supra,* 142 *N.J.* at 170, 662 *A.2d* 442.[1] The Court further expressly declined DiFrisco's request to include defendants Anthony Accetturo, Louis Auricchio, Thomas Ricciardi, Michael Perna, and Michael Tarcetta in the comparison group on the ground that "there appear[ed] to be no basis for an allegation that any of those defendants were either paid to commit murder or that they paid another to do so...." *Id.* at 167–68, 662 *A.2d* 442. And the Court denied DiFrisco's request to include defendant Patrick Lanzel in the comparison, finding his "motive for

---

[1] Walter Williams was the only defendant classified in the I–3 subcategory for "other pecuniary motive" killers at the time of DiFrisco's proportionality review. *See DiFrisco III, supra,* 142 *N.J.* at 167 n. 3, 662 *A.2d* 442. While dismissing Williams, the Court allowed Michael Rose, classified as an I–1 defendant, to remain in the group despite the fact that Rose's sentencing jury also failed to find the c(4)(d) aggravating factor.

killing was not pecuniary; therefore [his] comparison with defendant is inappropriate." *Id.* at 169, 662 A.2d 442. Lanzel killed his cousin's parents so that he and his cousin could share the proceeds of their life insurance and inheritance.

Thus, the thrust of the Court's language in *DiFrisco III* is quite clear: inheritance killings or killings for insurance proceeds—specifically, non-contract murders—are not "pecuniary" within the meaning of the death penalty statute.

The error in the present case was exacerbated by the trial court's jury instruction on the c(4)(d) aggravating factor. The court instructed the jury that for the c(4)(d) factor to apply and for defendant to be death-eligible the jurors "must unanimously find, beyond a reasonable doubt, that, at least, one of the purposes John Chew had, for murdering Theresa Bowman, was to obtain the insurance proceeds." The court continued: "although the receipt of the insurance proceeds does not have to be the defendant's exclusive purpose for killing Theresa Bowman, the receipt of such proceeds must be much more than just an incidental benefit to the defendant, because of Theresa Bowman's death. That is, the expectation of pecuniary gain must be the cause of the murder, or one of the causes of the murder, and not a result of it." By inserting the phrase 'to obtain insurance proceeds' in place of the statutory language 'for pecuniary gain' without reference to contractual arrangements, the court deprived Chew's penalty jury of any opportunity to apply the c(4)(d) factor as statutorily defined.

The resulting prejudice is tantamount. Chew would not have been death-eligible but for the jury's finding that his conduct met that contemplated by the c(4)(d) factor. Had that jury finding been based upon a court instruction consisting of a reading of the statutory language, defendant might have only complained that the statutory language is vague. But here the trial judge's decision to redefine the statutory provision in terms relevant to the case rendered the jury's finding of the c(4)(d) aggravating factor nothing more than a finding that Chew committed the

murder to collect the insurance proceeds. Given that the statutory provision does not apply to insurance proceeds in the absence of a contract to kill, defendant was not death-eligible, the jury's finding of the c(4)(d) aggravating factor was in error, and vacation of Chew's death sentence is still required. *Accord Chew, supra*, 150 *N.J.* at 99–101, 695 *A.*2d 1301 (Handler, J., dissenting).

It is unsettling to compare the death sentence of a defendant who by law should not have been death-eligible with the sentences of others who were. Nevertheless, given that a majority of this Court affirmed defendant's conviction and death sentence on direct appeal, *see id.* at 88, 695 *A.*2d 1301, Chew is constitutionally entitled to proportionality review. *See N.J.S.A.* 2C:11–3e; *State v. Marshall*, 130 *N.J.* 109, 117, 613 *A.*2d 1059 (1992) (*Marshall II* ).

### III

The principles of proportionality review are often recited. The applications of those principles are less secure, but for purposes of this review they remain those veteran and familiar: statistical frequency analysis, comprised of the salient-factors and index-of-outcomes tests, and precedent-seeking review, a case-by-case comparison of defendant's sentence with those received by similarly situated defendants. *See ante* at 199, 731 *A.*2d at 1078.

The basic standard by which we have measured disproportionality has been that "[a] death sentence is comparatively excessive if other defendants with similar characteristics generally receive sentences other than death for committing factually similar offenses in the same jurisdiction." *Marshall II, supra*, 130 *N.J.* at 153–54, 613 *A.*2d 1059 (citation omitted). In other words, a death sentence is not disproportionate if it is generally received by similarly situated defendants. *See DiFrisco III, supra*, 142 *N.J.* at 171, 662 *A.*2d 442; *State v. Martini*, 139 *N.J.* 3, 30, 651 *A.*2d 949 (1994) (*Martini II* ); *but see Cooper II, supra*, 159 *N.J.* at 93–94, 116, 731 *A.*2d 1000 (emphasizing that sentence is disproportionate if it is "aberrational" or if defendant has been "singled out

unfairly for capital punishment"); *Harvey III, supra*, 159 *N.J.* at 356–57, 731 *A*.2d 1121 (Handler, J., dissenting) (noting Court has used up to fourteen different standards and substandards for measuring disproportionality); *Loftin II, supra*, 157 *N.J.* at 417–18, 724 *A*.2d 129 (Handler, J., dissenting) (noting Court has used at least six different standards for measuring disproportionality). The application of these standards, I maintain, requires some notion of numerical preponderance. *Accord Loftin II, supra*, 157 *N.J.* at 419–20, 724 *A*.2d 129 (Handler, J., dissenting); *DiFrisco III, supra*, 142 *N.J.* at 212, 662 *A*.2d 442 (Handler, J., dissenting); *Martini II, supra*, 139 *N.J.* at 90–91, 651 *A*.2d 949 (Handler, J., dissenting); *State v. Bey*, 137 *N.J.* 334, 408, 645 *A*.2d 685 (1994) (Handler, J., dissenting) (*Bey IV*).

The deficiencies attendant to our proportionality review are as customary as the process itself. From the inaugural use of these models, the Court noticed problems; and with subsequent scrutiny, defects once hidden have become recognizable blemishes. *See generally Loftin II, supra*, 157 *N.J.* at 414–15, 724 *A*.2d 129 (Handler, J., dissenting) (discussing failure to identify standard by which to measure general imposition of death penalty and inherent subjectivity of precedent-seeking review); *Martini II, supra*, 139 *N.J.* at 82–106, 651 *A*.2d 949 (Handler, J., dissenting) (also discussing Court's use of reversed death sentences in proportionality review universe).

In light of these defects, the Court appointed the Honorable David S. Baime as Special Master to evaluate the proportionality review methodology. *See Loftin II, supra*, 157 *N.J.* at 263–77, 724 *A*.2d 129 (Order). The Special Master's report, submitted April 28, 1999, confirms that aspects of our methodology are faulty and in need of revision. *See* Honorable David S. Baime, *Report to the New Jersey Supreme Court: Proportionality Review Project* 6–7 (Apr. 28, 1999) (*Special Master Report*). As I note elsewhere, I cannot in good faith support the majority's decision, *see ante* at 196, 202, 731 *A*.2d at 1077, 1080, not to consider the Special

Master's recommendations, which are significant, before assessing the proportionality of Chew's death sentence. *See Harvey III, supra,* 159 *N.J.* at 354, 731 *A.*2d 1121 (Handler, J., dissenting); *Cooper II, supra,* 159 *N.J.* at 163, 182, 731 *A.*2d 1000 (Handler, J., dissenting). At the very least, the *Special Master Report* assures us that there are many problems that contribute to the inadequacy of our proportionality review, and ultimately to the arbitrary nature of defendant's death sentence. With that in mind, I discuss herein only those that pose particular problems in defendant's case.

### A.

Before undertaking frequency and precedent-seeking analyses of Chew's death sentence, I note my objection to the Court's adjustment to Chew's comparison group. Having sentenced Chew as a member of a group of pecuniary gain killers from which he should have been set apart, the Court now proceeds in proportionality review to exclude Walter Williams, a defendant with whom Chew has the most in common, from Chew's AOC-designated comparison group. Further, the Court's inclusion of contract-murder defendants in Chew's proportionality review does not square with the Court's exclusion of non-contract pecuniary-motive defendants in *DiFrisco III,* where the defendant was a contract killer; the small sample size of the I–3 category does not eviscerate this intellectual hurdle. I also disagree with the Court's decision not to compare Chew's sentence to the sentences of certain defendants outside the I category who killed in furtherance of a pecuniary motive.

### 1.

Chew was assigned to category I–3. *See CCH Report* (using database including all death-eligible cases through July 31, 1997). Subcategory I–3, which designates defendants in the I category who did not commit a contract killing, *see id.,* tbls. 6–7, consists of three defendants, including Chew, *see id.,* tbl. 7, each of whom

killed for insurance or inheritance. Of these, Chew is the only one for whom a jury found the c(4)(d) aggravating factor. That finding was error, as this Court's reasoning in *DiFrisco III* supports. *See* discussion *supra* at 192–96, 731 *A*.2d at 1074–76.

The Court removes Walter Williams from the I–3 group in response to the State's objection because the jury rejected the c(4)(d) (pecuniary-motive) aggravating factor at Williams's penalty trial.[2] *See ante* at 199, 731 *A*.2d at 1078. The Court reasons— and Chew improvidently concedes—that Williams and Chew are not, therefore, similarly situated. *See id.* at 199–200, 731 *A*.2d at 1078–79. I disagree and object to Williams's removal. Whereas DiFrisco was a contract killer, from whose comparison group Williams was therefore sensibly removed, Chew and Williams— each a unilateral actor—have much in common. By this Court's able judgment in *DiFrisco III*, Chew would be properly excluded from DiFrisco's review as well. By the same reasoning, Williams must remain in Chew's comparison group.

Although we are not in any position to modify Chew's prosecution and conviction as a death-eligible defendant in the wake of this Court's affirmance of Chew's conviction and sentence on direct appeal, *see Chew, supra*, 150 *N.J.* at 88, 695 *A*.2d 1301, we may at least partially remedy the unfairness of the situation by comparing Chew to Walter Williams, who, unlike Chew, was properly found not to have qualified for aggravating factor c(4)(d). We may also consider the impropriety of placing great weight in a comparison of Chew, who apparently murdered for insurance proceeds, to defendants who were party to a contract killing. I would leave Williams (and Rose) in the comparison group for

---

[2] By the same logic upon which this Court excludes Williams, the Court also excludes Michael Rose, whose jury rejected the c(4)(d) aggravating factor as well. This Court included Rose as a comparison case in *DiFrisco III, supra*, 142 *N.J.* at 170–71, 662 *A*.2d 442. I would not exclude Rose from the comparison group here.

frequency analysis, and would emphasize comparison of defendant to Williams and other similarly situated defendants extrinsic to the I category on precedent-seeking review.

2.

In addition to the improper exclusion of Walter Williams from the comparison group, I lament the Court's failure to compare Chew's sentence for purposes of precedent-seeking review to the sentences of select other defendants not classified in the I category who killed in furtherance of a pecuniary motive under circumstances similar to defendant.

Defendant presented thirty-four cases extrinsic to the I category that he deemed relevant for our comparison of precedent.[3] The Court, abiding by the principle of unique classification, refuses to include any of the cases outside the I category in Chew's review. *See ante* at 200–01, 731 *A.2d* at 1079 (citing *DiFrisco III, supra,* 142 *N.J.* at 167, 662 *A.2d* 442). The Court categorically rejects comparison of Chew's case to the preponderance of the cases suggested by the defendant because they are robbery murders, which the Court views as "significantly different from

---

[3] Five of the cases suggested for comparison by defendant involved multiple victims, and were therefore AOC-classified in the A category: Patrick Lanzel (A–1); Frank Masini 2(A–1); Ronald Mazique (A–1); Roy Watson (A–1); and Bobby Lee Brown (A–3). *See CCH Report,* tbl. 7. Two of the cases were classified by the AOC in the B category because the defendants had prior murder convictions: John Fauntenberry (B–1) and Richard Feaster 2(B–1). *See ibid.* One of the proposed comparison cases, Robert Zeuner, was classified by the AOC as G–2 for residential burglary with forced entry and without particular violence or terror. *See ibid.* The remaining twenty-six cases suggested by defendant involved robbery murders and were AOC-classified in the E category: Dwayne Caviness (E–1); Albert Fains (E–1); Carlton Felder (E–1); Matthew Ploppert (E–1); Anthony Szadorski (E–1); Wanda Campbell (E–2); James Fitzpatrick (E–2); Darren Grant (E–2); Michael Jones (E–2); Ira Musgrove (E–2); Richard Redden (E–2); Abdel Saleh (E–2); George Shaffer (E–2); Larry Durden (E–3); Emmanuel Charles (E–5); Richard Feaster 1(E–5); David Mark Russo (E–5); Corey Washington (E–5); Charles Williams (E–5); Richard Cain (E–6); George Lazorisak (E–6); Vernon McIver (E–6); Carl Norman (E–6); Kevin Smith (E–6); Ronald Pierce (E–6); and Mark Robinson (E–6). *See ibid.*

pecuniary-motive murders." *Ibid.* I disagree with the Court on both points.

Although I do not favor unique classification as a principle, I recognize the possibility that in some instances an AOC-classification may be sufficiently comprehensive to include all death-eligible cases relevant for a precedential review of a defendant's sentence. That is not so in this case. Defendants who murdered for insurance proceeds or inheritance should not be excluded from Chew's precedent-seeking review merely because they are classified in a category that trumps the I category for purposes of AOC-classification. Whether a defendant kills one person or more than one person for insurance proceeds or inheritance, the anticipated pecuniary gain surely is the "essential attribute" of the crime. Therefore, insofar as our proportionality review comparisons are "an aid to understanding a defendant's death sentence in relation to other defendants whose murders share the same 'essential attribute,'" *ante* at 201 n. 3, 731 *A.*2d at 1079 n. 3, Patrick Lanzel, classified as A-1 for a multiple homicide, who killed both of his cousin's parents for an expected inheritance, should be added to the review. *See* discussion *infra* at 271–72, 731 *A.*2d at 1118. The case of Darrell Collins, who killed his wife and son for insurance proceeds but for whom the jury found no aggravating factors, should also be compared to defendant's on precedent-seeking review. *See ibid.*

The Court's categorical rejection of comparison to robbery murders raises a fundamental question regarding the AOC's salient-factor groupings. Elements of a contract killing arguably make it distinguishable from a murder that occurs during the commission of a robbery. Contrary to the Court's assertion, however, there is not an objectively significant difference between all robbery murderers and defendants who kill for insurance proceeds or inheritance. Robbery murders involving victims who were acquainted with and targeted by their assailant, in particular, bear an intrinsic similarity to murders for insurance or inheritance, in which the defendant is a beneficiary. The nature of cases in the current death-eligible universe suggests that defen-

dants such as Chew who acted alone and murdered for insurance proceeds or inheritance, now classified by the AOC as I–3, may have as much if not more in common with certain classes of robbers, particularly those who murdered and robbed acquaintances, now classified as E–6, than they do with conspiratorial contract killers.[4] This is most apparent in the case of codefendants Carl Norman and Kevin Smith, who killed a friend to acquire the inheritance the victim had received from a deceased relative a week prior; and in the case of William Cooper, who murdered the victim, a coworker, for his paycheck. *See* discussion *infra* at 272–74, 731 *A.*2d at 1118–19.

---

[4] There are twenty-one death-eligible defendants classified in the E–6 category for murders involving robbery between acquaintances: Jhi–Mar Anderson (sentenced to 20 years in prison); Richard Cain (life); Reginald Clark (20 years); William Cooper (life); Larry Daniels (life); Salvatori Ferrari (life); Clifford Graf, Jr. (life); Michael Grant (life); Louis Harris (15 years); Frederick Hedgespeth (life); Richard Jefferson (life); Nathaniel Johnson (life); George Jones (30 years); Bruce King (30 years); George Lazorisak (life); Vernon McIver (life); Carl Norman (31 years); Ronald Pierce (life); Mark Robinson (27 years); Kevin Smith (30 years); and Roy Sullivan (life). *CCH Report*, tbl. 7A; *see id.*, Narratives. Only two of these defendants, George Lazorisak and Ronald Pierce, reached a penalty trial. *See id.*, Narratives.

Of the E–6 homicides, many involved circumstances that are distinguishable from Chew's homicide offense. Some of the murders resulted from defendants' briefly premeditated decisions to take possessions or money from people with whom they were minimally acquainted. *See, e.g.,* Larry Daniels (murdered boy he knew from neighborhood to get victim's sneakers and sweatpants); George Lazorisak (murdered man he picked up same night at nightclub primarily to obtain victim's car); Vernon McIver (male prostitute murdered client met night before for victim's money and car); and Ronald Pierce (slit throat of man he and codefendant met same night at bar seeking victim's cocaine). Others are heat-of-the-moment murders of friends or relatives who refused to give money to the defendant. *See, e.g.,* Reginald Clark (murdered aunt after she refused to give him $20); Salvatore Ferrari (murdered mother when she refused to give him money); Louis Harris (murdered drinking acquaintance who refused to give him money); Frederick Hedgespeth (murdered acquaintance who refused to give $20); Nathaniel Johnson (stabbed grandmother twice in chest during argument over money); Roy Sullivan (killed elderly friend who refused to give him money to buy drugs). Some of the crimes involved relationships which were predominantly drug-related. *See, e.g.,* Jhi–Mar Anderson; Michael Grant; Richard Jefferson; and Bruce King.

Insofar as the Court insists upon adhering to the principle of unique classification, the issue of whether killings for insurance proceeds and inheritance might be better placed among robbery murders than with contract killings, or perhaps combined with robbery murders between acquaintances, warrants consideration. At present, I would expand precedential review of Chew's sentence to include comparison to certain defendants classified in the robbery murder category, rather than impose a blanket restriction prohibiting such comparison. Therefore, in addition to all members of the I category, as well as Patrick Lanzel and Darrell Collins, I would focus particular attention upon those defendants whose crimes share characteristics fundamental to Chew's, such as a pecuniary motive that exceeds mere cash or possessions, significant premeditation, and some acquaintance with the victim— namely, those previously mentioned, William Cooper, Carl Norman and Kevin Smith.

## B.

I discuss Chew's frequency analysis briefly because I am in overall agreement with the Court that the statistical results as such do not provide a basis for finding disproportionality of sentence. As noted previously, *see supra* at 199, 731 *A*.2d at 1078, I would include Walter Williams in the I-3 and Michael Rose in the I-1 category for purposes of comparison. With or without Rose and Williams, however, Chew's numbers are not convincing. Pecuniary-gain murderers have a relatively high death-sentencing rate. Moreover, the factors producing Chew's high culpability level in the index-of-outcomes regressions are derivative of his own heinous crime.

According to the salient-factors test, looking to the death-sentencing rates and the penalty-phase advancement rates for all pecuniary-motive murderers, with Rose and Williams excluded from the comparison group, the death sentencing rate for I-class

defendants is fifty percent.[5] *See CCH Report*, tbl. 7 (reprinted *ante* at 204, 731 *A*.2d at 1081). Adding Rose and Williams to the calculation, the death sentencing rate statistic drops to forty percent. *See infra*, Appendix A. These statistics suggest that similarly situated defendants receive sentences other than death only slightly more often than death sentences. Considered alone, the numbers do not provide a basis for a strong argument that defendant's sentence was disproportionate. The ten percent decrease in death-sentencing rate when Williams and Rose are added to the calculation, however, convincingly demonstrates that "the small sample sizes of the groups in this salient-factors test preclude us from investing great weight in those results." *Di-Frisco III, supra*, 142 *N.J.* at 174, 662 *A*.2d 442.

Chew's index-of-outcomes ratings are even less helpful to his claim of disproportionality. The results of the regressions assessing only penalty-trial cases demonstrate that when penalty-phase juries have decided sentences for similarly situated defendants, they have generally imposed death. Considering statutory factors only in the penalty-trial universe, Chew falls in culpability level five, in which seventy-six percent of the defendants received the death penalty. *See CCH Report*, tbls. 23, 24; *ante* at 207, 731 *A*.2d at 1083. He fares no better by a statutory and non-statutory factor measure, falling in culpability level four, where nine of the twelve defendants who proceeded to penalty trial were sentenced to death. *See CCH Report*, tbls. 21, 22; *ante* at 207, 731 *A*.2d at 1083.

Measured by the full universe of death-eligible defendants and statutory factors only, defendant is in culpability level three, in which the death-sentencing rate is fifty-two percent. *See CCH Report*, tbls. 23, 25; *ante* at 207, 731 *A*.2d at 1083. Although

---

[5] I refer only to those statistics that exclude defendant from the comparison group. As I have noted previously, "gauging the proportionality of a defendant's sentence by comparing it to a group of which he is a member, skews the analysis." *Loftin II, supra*, 157 *N.J.* at 420 n. 19, 724 *A*.2d 129 (Handler, J., dissenting).

defendant appears less culpable here, the mid-range result does little to offset the high percentage of death-sentenced peers reflected in the other tests.

Only when the statutory and non-statutory variables are considered in the full universe does defendant's death sentence appear disproportionate. By this regression, defendant's culpability score falls to nineteen percent and he occupies culpability level one, at which only five percent of the defendants have been death-sentenced. *See CCH Report*, tbls. 13, 14; *ante* at 207, 731 *A.2d* at 1083. This regression reveals a disturbingly low probability of death; yet, in light of the other regressions, the results of this regression do not establish that defendant's death sentence is disproportionate.

Nevertheless, the low predicted value of the last regression requires this Court to carefully scrutinize defendant's sentence in precedent-seeking review. In addition, the exceptionally large confidence intervals in this case and the wide variance in defendant's culpability scores demand that the Court not accord this test substantial weight.[6] *See ante* at 209–10, 731 *A.2d* at 1084.

---

[6] The Court continues indiscriminately to compare defendants with those whose sentences were the subject of prior proportionality review. *See ante* at 207–10, 731 *A.2d* at 1083–84. I would restrict comparisons between Chew and prior proportionality review defendants to circumstances in which they share culpability levels. *See Loftin II, supra,* 157 *N.J.* at 423–25, 724 *A.2d* 129 (Handler, J., dissenting). Because culpability levels are not necessarily synonymous across databases, *see ibid.; see also Special Mater Report, supra,* at 93–94 (discussing and charting "instability" of culpability scores across cases), in undertaking such a limited comparison, Chew's numbers would properly be compared with numbers for prior proportionality review defendants gleaned from the same regression.

However, for the purposes for which the Court uses the index-of-outcome test results—namely, to conduct a comparison of Chew's culpability ratings with those of prior proportionality review defendants regardless of culpability level—comparison based upon the data this Court used in a given defendant's proportionality review must would provide a more accurate measure. For example, the data used to measure Martini's culpability must be derived from the *Martini Report*. Therefore, although I agree with the Court's choice to apply the index-

Indeed, the index-of-outcomes regressions are so unreliable that they are, arguably, useless. *See Special Master Report, supra,* at 107 (recommending that the Court abandon the index-of-outcomes test).

## C.

Although the Court's adjustments to the comparison group have minimal effect on the statistical frequency analysis results, the definition of Chew's comparison group substantially affects precedent-seeking review of his sentence. Before addressing how a more expansive review accentuates the arbitrary nature of Chew's death sentence, I pause to reflect upon the precedent-seeking analysis conducted by the Court.

### 1.

Generally, I agree with the Court that Chew's culpability is high. The manner in which Chew murdered his girlfriend was brutally cruel. Nevertheless, the attention the Court devotes to Chew is routine. The Court fails to distinguish Chew's insurance-motivated crime from contract killings. Even if I were to agree with the relevance of a comparison between Chew and contract murder defendants, I would find the Court's analysis reckless.

Attempting to differentiate Chew from the I–2 defendants, the Court claims, "[n]one of the defendants in this category killed solely for pecuniary gain." *Ante* at 218, 731 *A*.2d at 1089. And explains: "Brand paid to rid his family of an abusive brother, the Engel brothers planned the death of William's ex-wife out of a warped sense of jealousy and resentment, and Marshall had his wife killed in order to eradicate an obstacle to his extra-marital romance." *Id.* at 218, 731 *A*.2d at 1089. How this distinguishes Chew, whose motivation in part for killing Bowman, as the record amply demonstrates, was because she was leaving him, is a mystery. The Court's distinction of Marshall from Chew is awk-

---

of-outcome regression results from the present database, I do not agree with its reason for doing so or the comparison for which they use the data.

wardly moralistic, portraying Marshall as less culpable because he killed not just for money, but to be with his paramour.

The Court then attempts to distinguish Chew from the Engels brothers, "[m]ore important[ly]," on the ground that the Brand and Engels juries found the c(5)(a) mitigating factor. *See id.* at 218, 731 *A.*2d at 1089. This does not gel with the Court's claim to "recognize that even when a jury rejects a specific mitigating factor, it may nonetheless remain influenced by the evidence presented in support of that mitigating factor." *Id.* at 210, 731 *A.*2d at 1085 (citing *Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129; *DiFrisco III, supra,* 142 *N.J.* at 185, 662 *A.*2d 442; *Bey IV, supra,* 137 *N.J.* at 368, 645 *A.*2d 685). The Court here disregards Chew's substantial account of his mentally and emotionally troubled life. The inconsistency continues as Chew is haphazardly declared more culpable for engaging others in crime, *see id.* at 217, 731 *A.*2d at 1088, but also "more blameworthy" for having "carried out his bloody plot alone," *id.* at 219, 731 *A.*2d at 1089.

The Court's attempts to differentiate Chew from the I–1 defendants are equally senseless. Referring to this Court's assessment of why Chew deserves to die while other life-sentenced I–1 defendants (Burroughs, Harris, Irizarry, Melendez, and Pinchom) do not, one may glean that Chew's death sentence is understandable—proportionate—because Chew was not cooperative with the police, he was relatively mentally stable, and he "planned the murder ... for over a year." [7] *Id.* at 217–18, 731 *A.*2d at 1089; *see also id.* at 220, 731 *A.*2d at 1090 ("In sum, unlike many of the life-sentenced pecuniary-motive murderers, Chew did not substantially assist the State and was not mentally disturbed when he murdered the victim."). The notion that these characteristics

---

[7] The claim that Chew "planned" the murder for over a year, *see ante* at 217–18, 731 *A.*2d at 1089, is an overstatement. The most that can confidently be drawn from the record in this case is that Chew had *considered* killing Bowman for over a year.

rationalize a distinction between life and death sentences is notably absurd, and illuminates the problematic moral determinations this Court undertakes in precedent-seeking review. *Accord Marshall II, supra,* 130 *N.J.* at 273–74, 613 *A.*2d 1059 (Handler, J., dissenting).

The Court slights the defendant by conducting a whimsical review. If this is what proportionality review has come to—if the root of the analysis is "whatever works"—an opinion simply affirming or reversing defendant's sentence would suffice. Of course, we strive to accomplish more than this. Accordingly, adjustments are warranted.

2.

I take particular note of the Court's comparison of Chew to I–3 defendant Celestine Payne. Payne killed her husband with poison, after her request of a friend to fatally shoot her spouse went unfulfilled. As a result, Payne, the unemployed mother of four, received $49,000 in life insurance proceeds. Subsequently, Payne took out life insurance policies on two of her boarders, and hired Charles Pinchom to kill them both. Pinchom's attempt was only partially successful, murdering one. Payne pled guilty to two concurrent life terms with thirty-year parole disqualifiers.

The Court emphasizes Payne's clinically diagnosed depression and schizophrenia as the distinguishing factor between her life sentence and Chew's death verdict. *See ante* at 215, 731 *A.*2d at 1087. In *Loftin II, supra,* the Court similarly sought to distinguish Loftin's death sentence from the life sentences of similarly situated defendants on the ground that Loftin failed to present uncontroverted evidence that he suffered from mental disease or defect at the time of the crime. 157 *N.J.* at 342–43, 345, 724 *A.*2d 129 (distinguishing Loftin from B–2 death-sentenced defendants and B–3 defendants). Although the Court may not be completely off the mark in thinking that jurors respond sympathetically to evidence of mental disease, using clinical evidence of mental illness as a dispositive basis for distinction, I fear, is somewhat unfounded

and quite possibly mistaken. Defendant has presented evidence that defendants who qualify for the *N.J.S.A.* 2C:11–3c(5)(a) mitigating factor, which recognizes extreme mental or emotional disturbance, are more likely to be prosecuted capitally than defendants who do not present evidence of extreme mental or emotional distress. *See CCH Report,* tbls. 7, 10 (reprinted *ante* at 224, 731 *A.*2d at 1092); *see also ante* at 225, 731 *A.*2d at 1093 (recognizing "a positive correlation between the mental disturbance factor and capital prosecution"). The statistics also show that, although defendants with the c(5)(a) factor are slightly less likely to be sentenced to death at a penalty trial, they are nevertheless sentenced to death at a higher rate than death-eligible defendants generally. *See CCH Report,* tbls. 7, 10. Even if these results are somewhat anomalous, they present the possibility that evidence of mental disturbance does not always help a defendant before a sentencing jury.

The Court's assessment regarding mental distress evidence is conclusory. Although this Court's proportionality review borders on mechanical, we must give our jurors more credit. We must assume that jurors' deliberations are more complex and emotions more proximate than the Court's analysis reflects. We should not dismiss a jury's awareness of the possibility that many individuals with psychiatric impairments seek neither clinical diagnosis nor treatment—indeed, such avoidance may be symptomatic of the affliction. If it is more than hyperbole that the first step to recovery is acknowledging the problem, Celestine Payne may in a juror's view be a step beyond Chew along that path. In the same regard, jurors might have concluded that the medication Payne was taking was helping her condition. The Court, therefore, is impulsive to rely so confidently on the presentation of evidence of mental distress as a dispositive factor.

Recognizing the impetuous nature of the Court's interpretation of extreme emotional or mental distress does little to alter the fact

that Chew presented little direct evidence of present mental problems. Yet Chew offered a substantial account of his troubled upbringing. See supra at 251–52, 731 A.2d at 1106–07. At least one juror found all of the evidence of mental distress presented by Chew to contribute to the catch-all mitigating factor. See ibid. To some extent, as the previous discussion suggests, the mental problems rooted in Chew's childhood and adolescence are implicit in his homicidal act and reflected in the means he used to deal with his personal problems.

Chew and Payne, in fact, have quite a lot in common. Both killed for insurance proceeds; both killed a significant other; both killed helpless victims; and both planned the murders in advance. But Chew is less culpable than Payne in two respects: whereas Payne killed her husband, and paid Pinchom to kill two boarders, Chew killed only Bowman and acted alone. And, whereas Payne killed only for insurance proceeds, Chew's homicidal tendencies were in part motivated by the fact that Bowman was going to leave him that very day. Were Chew's sentence compared only to Payne's, it would certainly seem unfair.

3.

Comparison to Payne's case alone cannot support a finding of disproportionality. There are, however, a number of defendants similarly situated to Chew, some even more culpable, who received life sentences. Comparison to these cases, a number of which are excluded from the Court's review, demonstrates that Chew's sentence is arbitrary and, therefore, both inhumane and unconstitutional, even if by the Court's limited proportionality review analysis it is not clearly disproportionate.

When the Court undertakes to compare Chew to "the only other killer in the I–3 category," ante at 215, 731 A.2d at 1087, it blithely overlooks Walter Williams, a defendant most like Chew, excluded from the analysis because the jury failed to find the c(4)(d) factor. Williams is not the only defendant on record who killed a loved

one or relative to collect insurance proceeds or an inheritance that is excluded from Chew's review. Defendants Patrick Lanzel, classified as A–1, and Darrell Collins are left out of the Court's comparison as well. What makes this acute class of offenders (Payne, Williams, Lanzel, Collins, and Chew) noteworthy is that, with the exception of Chew and Williams, all killed multiple victims, and, more remarkably, all with the exception of Chew were sentenced to life.[8]

Walter Williams, a thirty-six year old police officer, poisoned his first wife with potassium cyanide to cover up an affair that had developed into a bigamous marriage. Williams also expressly sought to receive the first wife's estate. Williams had no prior record, and presented no clinical evidence of mental disturbance, but claimed to have flashbacks related to his experience in Vietnam. He was sentenced to life in prison with a thirty-year parole disqualifier.[9]

Patrick Lanzel conspired with his cousin to kill her father, his uncle, and to split the expected inheritance. After attempts to get the uncle to overdose on his own medication and to kill the uncle with rat poison failed, defendant beat his uncle to death with an iron rod. Defendant then went upstairs and murdered his aunt in the same way. He also beat a younger cousin, who survived. Defendant was eighteen at the time and ultimately confessed. He had partially completed college, had no criminal record, and had worked as a securities broker and a caddy. He did not have a

---

[8] In *Marshall II, supra,* the Court compared Marshall to Walter Williams, Darrell Collins and Thomas Johnston, all of whom killed their wives in a premeditated fashion. 130 *N.J.* at 175–76, 178–79, 613 A.2d 1059. The Court included the three defendants in Marshall's precedent-seeking review, not as members of Marshall's comparison category, the I class, but as "cases involving highly-premeditated, cold-blooded murders of a defenseless wife" or as "first-time murderers of spouses." *See id.* at 170, 175, 613 A.2d 1059.

[9] The fact summaries are derived from the AOC Narratives provided in the *CCH Report.*

history of mental disease, except that he claimed to have had suicidal tendencies in the months before the murder. Lanzel was sentenced to two consecutive fifty-year terms with thirty-year parole disqualifiers.

Darrell Collins stabbed his wife multiple times, cut her throat ear to ear, and suffocated his infant son. He had no history of mental illness or drug abuse, and denied having committed the murders. The sentencing judge recognized that Collins murdered his wife and child to collect the benefits of their life insurance policies, an aggregate of $105,000. The jury found Collins guilty of the non-capital murder of both victims. As with Williams, the jury did not find the c(4)(d) aggravating factor for pecuniary gain. Because no other aggravating factors were found, Collins's case did not proceed to penalty trial. Collins was sentenced to one life term with a thirty-year parole disqualifier on one count, and a consecutive thirty-year term on the second.

Comparison of defendant's case to these cases is troubling. Williams, Collins, and Lanzel all killed loved ones or relatives to profit off an insurance policy or inheritance. All premeditated their murders. None presented evidence of clinical mental illness. And Lanzel and Collins killed more than one person. In short, Williams, Collins, and Lanzel were each more culpable than Chew, yet, like Celestine Payne, were not sentenced to death.

In addition, the crimes of Carl Norman, Kevin Smith and William Cooper, all classified in the robbery murder category, are too similar to Chew's to be ignored. Carl Norman and Kevin Smith decided to rob a friend upon learning that he had inherited approximately $40,000. One week later, they invited the victim to Norman's home under the pretext of watching a football game. Norman then informed Smith that they were going to kill the victim as well. Two hours after the victim arrived, Norman attacked, beating the head of the victim with a wooden statue. He and Smith then strangled the victim with an electrical cord and

suffocated him with a plastic bag. They took $227 from the victim's body. Norman had prior convictions for burglary, grand theft, robbery and aggravated assault. Smith had multiple prior convictions for resisting arrest, assault, drug possession and burglary. Neither had mental health problems. Norman pled guilty to felony murder and was sentenced to thirty-one years in prison with a thirty year parole disqualifier. Smith pled guilty to aggravated manslaughter and robbery, for which he was sentenced to consecutive terms of thirty years and ten years, respectively.

William Cooper, a construction worker, murdered a coworker, first by beating him with a sledgehammer and then by attempting to decapitate the victim with a circular saw and electric drill. Defendant's apparent intent was to rob the victim of a $360 paycheck. Cooper had previously been convicted for weapons and assault offenses. He used drugs regularly, but claimed to be in good mental health. He was convicted of murder and was sentenced to life in prison with a minimum parole ineligibility of thirty years.

These crimes were committed to obtain some wealth that would not automatically follow from a robbery. Norman and Smith could not have expected that their victim would carry his $40,000 inheritance to a social event, and Cooper would have had to tender the victim's check in order to receive any money. Accordingly, these robbery murders are kin to murders for insurance proceeds such as Chew's. As in the cases of Williams, Collins, Lanzel and Payne, the murders were premeditated, and the defendants knew their victims. Further, the defendants did not present evidence of clinical mental illness; they did not even claim to be otherwise mentally or emotionally disturbed.

The bottom line is that Norman, Smith and Cooper committed murders with the same "essential attribute" as Chew's and are relatively as culpable, yet were not sentenced to death—indeed, Norman and Smith pled guilty to less-than-life terms. Given this

new perspective, and recalling that Williams, Payne, Lanzel and Collins were life-sentenced, Chew's death sentence, which is not clearly disproportionate by frequency analysis or aberrational according to the Court's manner of precedent-seeking review, appears arbitrary nevertheless.

When a death sentence can be theoretically proportionate and simultaneously arbitrary, we have as a matter of common sense noticeably strayed from the purpose of our endeavor. We ought then to reconsider the purpose of proportionality review. To say that a death sentence is proportionate evokes an infrastructure established by this Court to serve a larger purpose, answer a larger question, and identify a larger problem. Proportionality review, as we have stated, seeks to discern if similarly situated defendants generally receive sentences other than death. *See Martini II, supra,* 139 *N.J.* at 20, 651 *A.*2d 949. The purpose of this inquiry is to assure that "the death penalty is being administered in a rational, non-arbitrary, and even-handed manner, fairly and with reasonable consistency." *Marshall II, supra,* 130 *N.J.* at 131, 613 *A.*2d 1059. It should follow naturally that an arbitrary sentence is also disproportionate. If our assessment of proportionality leads us to a different conclusion, one that conflicts with the larger issue, then that assessment must be wrong.

In such circumstances, we must not be confined by semantics or administrative rigor. Although we have accepted delineated restrictions for the sake of statistical comparison, we need not impose the same limitations in our review of precedent. "[I]t is crucial that we look beyond [the AOC's comparison groups] in precedent seeking review in order to gain as much insight as possible into a defendant's sentence." *See Harvey III, supra,* 159 *N.J.* at 360, 731 *A.*2d 1121 (Handler, J., dissenting). Disregarding classification, we should derive the most insight from those few cases that share most with defendant's, maintaining a course strict in purpose but less rigid in scope.

In this case, the Court finds defendant's death sentence proportionate. The statistics may so show, and Chew's death sentence, when compared to a plethora of other defendants designated by the majority, may not stick out as an error. We ought nevertheless to be disturbed by the fact that death sentences were not imposed upon those defendants whose crimes and circumstances most closely mirrored Chew's. The fact that the defendants who committed the most similar and more culpable crimes in very like circumstances received life sentences or less is sufficient evidence upon which to conclude that the death penalty has been arbitrarily imposed.

## IV

In conclusion, we may recall that Chew's death-eligibility rested on the improper application of the c(4)(d) aggravating factor and note that Chew is the only defendant on death row who murdered for insurance proceeds. Far from heralding that it is somehow less culpable to kill for insurance proceeds than to hire someone to do it for you or to do it for someone else,[10] I merely protest that the fine distinction between these acts, so recognized by the Legislature, see discussion supra at 192–96, 731 A.2d at 1074–76, can be the difference between life and death. By broadening the scope of precedent-seeking review in this case, the Court might recognize that Chew's sentence, if not disproportionate, is arbitrary. Matters of life and death may well be arbitrary in the natural world; they should not be in a court of law.

Chew's death sentence should be vacated.

---

[10] To make a determination of whether it is more humane, impassioned, or provoked to kill by your own hand or more cold, sinister, and removed to hire someone else to do it are the types of moral conundrums that place proportionality review precariously close to a resentencing.

# APPENDIX A

## SALIENT–FACTORS TEST: "I–3" SUBCATEGORY
### [excluding Williams]
### (data from CCH Report, tbl. 7)

| | Death–Sentencing Rate At Penalty Trial | Death Sentencing Rate for All Eligible Cases | Proportion of Cases Advancing to P–Trial |
|---|---|---|---|
| I–3 Incl. D | 100% ($\frac{1}{1}$) | 50% ($\frac{1}{2}$) | 50% ($\frac{1}{2}$) |
| I–3 Excl. D | N/A ($\frac{0}{0}$) | 0% ($\frac{0}{1}$) | 0% ($\frac{0}{1}$) |
| All Ds | 31% ($\frac{50}{163}$) | 12% ($\frac{50}{401}$) | 41% ($\frac{163}{401}$) |
| All Ds but D | 30% ($\frac{49}{162}$) | 12% ($\frac{49}{400}$) | 41% ($\frac{162}{400}$) |

## SALIENT–FACTORS TEST: "I–3" SUBCATEGORY
### [including Williams]
### (data from CCH Report, tbl. 7)

| | Death–Sentencing Rate At Penalty Trial | Death Sentencing Rate for All Eligible Cases | Proportion of Cases Advancing to P–Trial |
|---|---|---|---|
| I–3 Incl. D | 50% ($\frac{1}{2}$) | 33% ($\frac{1}{3}$) | 33% ($\frac{1}{3}$) |
| I–3 Excl. D | 0% ($\frac{0}{1}$) | 0% ($\frac{0}{2}$) | 0% ($\frac{0}{2}$) |
| All Ds | 31% ($\frac{50}{163}$) | 12% ($\frac{50}{401}$) | 41% ($\frac{163}{401}$) |
| All Ds but D | 30% ($\frac{49}{162}$) | 12% ($\frac{49}{400}$) | 41% ($\frac{162}{400}$) |

## SALIENT–FACTORS TEST: "I" CATEGORY
### [less Rose and Williams]
### (data from CCH Report, tbl. 7)

| | Death–Sentencing Rate At Penalty Trial | Death Sentencing Rate for All Eligible Cases | Proportion of Cases Advancing to P–Trial |
|---|---|---|---|
| I Incl. D | 55% ($\frac{5}{9}$) | 31% ($\frac{5}{16}$) | 56% ($\frac{9}{16}$) |
| I Excl. D | 50% ($\frac{4}{8}$) | 27% ($\frac{4}{15}$) | 53% ($\frac{8}{15}$) |
| All Ds | 31% ($\frac{50}{163}$) | 12% ($\frac{64}{401}$) | 41% ($\frac{163}{401}$) |
| All Ds but D | 30% ($\frac{49}{162}$) | 12% ($\frac{49}{400}$) | 41% ($\frac{162}{400}$) |

## SALIENT–FACTORS TEST: "I" CATEGORY
### [with Rose and Williams]
### (data from CCH Report, tbl. 7)

| | Death–Sentencing Rate At Penalty Trial | Death Sentencing Rate for All Eligible Cases | Proportion of Cases Advancing to P–Trial |
|---|---|---|---|
| I Incl. D | 45% ($\frac{5}{11}$) | 28% ($\frac{5}{18}$) | 61% ($\frac{11}{18}$) |
| I Excl. D | 40% ($\frac{4}{10}$) | 23.5% ($\frac{4}{17}$) | 47% ($\frac{8}{17}$) |
| All Ds | 31% ($\frac{50}{163}$) | 12% ($\frac{50}{401}$) | 41% ($\frac{163}{401}$) |
| All Ds but D | 30% ($\frac{49}{162}$) | 12% ($\frac{49}{400}$) | 41% ($\frac{162}{400}$) |

*For affirmance*—Chief Justice PORITZ and Justices POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*For reversal*—Justice HANDLER—1.